Thomas W. Banks v. Commissioner.
Banks v. Commissioner
Docket No. 42724.
United States Tax Court
T.C. Memo 1961-237; 1961 Tax Ct. Memo LEXIS 113; 20 T.C.M. (CCH) 1165; T.C.M. (RIA) 61237; August 22, 1961
*113 During the years ending December 31, 1936, through December 31, 1947, inclusive, petitioner owned an interest in various business ventures, including several gambling establishments. In addition, he made personal wagers on sporting events. A substantial amount of the gross income reported on his Federal income tax returns for each taxable year involved herein was derived from his gambling activities. No books or records relating to such activities were available for audit by respondent's agents. Using the net worth plus nondeductible expenditures method, respondent reconstructed petitioner's income for the taxable years involved. Held: 1. That the deficiencies for the years 1937 through 1940, inclusive, are barred by the statute of limitations. 2. That there is a deficiency in income tax of petitioner for 1941, but respondent has failed to prove that any part of the deficiency for that year was due to fraud with intent to evade income tax. Amount of deficiency for 1941 determined. 3. That with respect to the deficiencies determined for the years 1942 through 1947, inclusive, petitioner has failed to meet the burden of establishing error on the part of respondent, except to the extent *114 set forth in our Opinion. Adjustments and understatements determined. 4. That some part of the respective deficiencies for each of the taxable years 1942 through 1947, inclusive, was due to fraud with intent to evade taxes. 5. That any additions to tax under section 294(d) of the Code of 1939 for the year 1947 will be determined under Rule 50. Joseph A. Maun, Esq., and William R. Busch, Esq., for the petitioner. T. A. Steele, Esq., and L. A. Hanns, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income tax and additions to tax as follows: Sec. 294
Sec. 293(b)
(d)(2)
Addition
Addition
Year
Deficiency
to Tax
to Tax
1937
$ 645.94
$ 322.97
1938
780.28
432.93
1939
824.26
505.36
1940
780.43
408.21
1941
1,609.86
804.93
1942
24,447.02
12,223.51
1943
62,463.71
31,231.86
$ 3,295.86
1944
55,670.02
27,835.01
2,821.45
1945
46,808.10
23,404.05
2,750.37
1946
11,813.81
5,906.91
864.13
1947
9,042.65
4,521.33
659.87
Totals
$214,886.08
$107,597.07
$10,391.68 The figures for the year 1943 shown above represent the amounts alleged in a claim for increased deficiencies filed by respondent on June 30, 1959, and also alleged in the third amendment to answer filed by respondent *115 by leave of Court granted on August 26, 1959. In the statutory notice, the deficiencies determined in income and victory tax and additions to tax under section 293(b) and section 294(d)(2), both supra, for the year 1943 were respectively $49,450.03, $24,725.02, and $2,515.04. Respondent concedes that the addition to tax provided by section 294(d)(2), supra, is not applicable to the calendar years 1943 to 1946, inclusive. The principal issues presented for our consideration are: (1) Whether and to what extent petitioner understated his net taxable income for the years 1937 through 1947, inclusive; (2) whether any part of the deficiency determined for each of the years in question was due to fraud with intent to evade tax; (3) whether the statute of limitations bars assessment and collection of any of the deficiencies determined for the years 1937 through 1940, inclusive, and 1942; and (4) whether the addition to tax provided under section 294(d)(2), supra, is applicable to petitioner for the taxable year 1947. Findings of Fact Part of the facts are stipulated (orally and in writing) and are so found and incorporated by this reference. Background and General Facts Thomas W. Banks, hereinafter *116 sometimes called petitioner or Thomas, is an individual residing at 3817 Drew Avenue South, Minneapolis, Minnesota. For each of the calendar years 1937 to 1947, inclusive, petitioner filed Federal income tax returns with the collector of internal revenue for the district of Minnesota. Petitioner did not file any Federal income tax returns for the years 1920 to 1933, inclusive. Records of the district director for the district of Minnesota (formerly collector of internal revenue) contain no indication that Reta Lee Banks, petitioner's wife, filed a Federal income tax return for any year prior to 1942, except that said records show that petitioner's original return filed for the year 1940 was treated as a joint return of petitioner and his wife. Reta filed a separate Federal income tax return with the collector of internal revenue for the district of Minnesota for each of the years 1942 to 1947, inclusive. At the time of the trial petitioner was 64 years of age. Petitioner has been married to Reta since 1915. When petitioner first met his wife she was employed as a milliner. Thereafter, she quit her job and has never been employed since her marriage. Petitioner ran away from home at *117 13 years of age and went to Omaha, Nebraska, where he worked as a page boy at a hotel. He went into the military service in the spring of 1918 and was released in December 1918. After being released from the Army, petitioner worked in Kansas City, Kansas, as a bellboy. In 1919, he came to Minneapolis, Minnesota, and worked as head bellman at the Dyckman Hotel, and also sold whiskey to people in the hotel. After he stopped working at the Dyckman Hotel in July of 1920, petitioner hauled whiskey from Canada. He was engaged in this illicit activity to about 1924. During this period petitioner kept no records concerning his income and expenses. At the beginning of 1924, petitioner began hauling alcohol from Chicago. This operation continued until about 1929. About 1922, petitioner bought the National Cigar Store located in Minneapolis, Minnesota, and sold it about 1923. Around 1925, petitioner bought the Louana Apartment Hotel, Minneapolis, Minnesota, in partnership with another individual. About 1929 petitioner bought out the interest of the other partner. In 1931, petitioner sold the Louana Apartment Hotel and sustained a substantial loss in the sale thereof. Until the year 1931, petitioner's *118 principal occupation was selling alcohol. However, as time went on, the profit from alcohol sales became less and less. For several years petitioner sustained a loss rather than a profit from alcohol sales. In conducting his alcohol activities in the years about 1927 through 1929, inclusive, petitioner's only records consisted of a little vest pocketbook in which he personally recorded his daily sales. Petitioner kept no record of the cost price to him of the alcohol. In 1930 or 1931, petitioner, in combination with other individuals, commenced ordering alcohol that would be shipped in box cars. Generally, there would be 80, 90, or 100 drums of alcohol to a box car. During this period petitioner maintained offices at the West Hotel for the purpose of conducting his alcohol business. While conducting his business at the West Hotel petitioner "never" kept records. Petitioner was never in a position to know and did not pay any attention to any amount of money that he might be making at any time in connection with his alcohol activities. Petitioner ceased the alcohol business in 1931. While conducting the alcohol business petitioner had heard of the Federal income tax laws that existed *119 at that time. He knew that he was supposed to keep records of any income that he might have obtained from his alcohol activities. On November 14, 1929, petitioner pleaded guilty to a liquor conspiracy charge under Section 37 of the U.S. Criminal Code, in the United States District Court for the District of Minnesota, (3rd Div., St. Paul) and was fined $2,500, which he paid. From 1934 to 1940, petitioner worked as a commission salesman for Old Peoria Company, a liquor distributor. In 1934 a charge of conspiracy under Section 37, U.S. Criminal Code, to violate Sections 3258, 3296, and 3450, U.S. Revised Statutes, was made against various individuals in Minneapolis and St. Paul, including petitioner. The United States District Court for the District of Minnesota (4th Div., Minneapolis) accepted a plea of guilty from petitioner and fined him $2,000 which was paid by him. In January or February 1935, Robert Kinsey, an accountant, advised petitioner that he should "square himself with the Government." In this connection Kinsey was referring to years earlier than 1934. In 1934 as assessment was made against petitioner and other individuals for an alcohol tax liability in the total amount *120 of $33,589.92. On July 9, 1937, an offer in compromise was submitted on behalf of petitioner and others to compromise the alcohol tax liability. The terms of the offer were for a payment in the total amount of $5,000 to be paid as follows: $1,875 with submission of offer and $150 monthly until $5,000 had been paid. Said offer was subsequently accepted on October 7, 1937. In support of the offer in compromise, petitioner submitted to the Government a sworn affidavit dated July 2, 1937, pertaining to his financial condition. Said affidavit reads as follows: State of Minnesota, County of Hennepin: ss. Affidavit I, Thomas William Banks, residing at 3817 Drew Avenue South, in the City of Minneapolis, County and State aforesaid, being duly sworn, depose and states as follows: That I am 42 years of age and am married and that my wife's name is Reta Lee Banks. That my wife is not employed. That I am employed by the Old Peoria Liquor Company, 301 North Seventh St., Minneapolis. That my salary is $100 per week. That I have been employed by said company for approximately three years. That I also receive $25.00 per week for advertising purposes from the Seagrams Distilling Company, which I spend *121 in entertaining customers. That my wife and myself have a safety deposit box in the First National Bank & Trust Company of Minneapolis, standing in the name of myself and my said wife, Reta Lee Banks. That my wife owns the two story house located at 3817 Drew Avenue South, Minneapolis, where we reside. That the total value of house and lot is approximately $11,000. That same is encumbered with mortgage of between $7,000 and $8,000. That I contribute $110 monthly as payments of interest and principal on such mortgage. That I give my wife for living expenses each month approximately $250 which included the $110 payment on house mentioned above. That my wife owns a cottage located at 3952 Beard Avenue South valued at about $5,000 and mortgaged for about $3,500. That the rent received for such property pays the interest, taxes and principal payments on mortgage, and that I have not contributed anything of value in connection with the acquisition of this property. That I own about 105 shares of Cities Service Common stock, which is listed stock and worth about $4.00 per share. That I also own twenty (20) $1,000 Insull Utility Bonds, which have no value. That I also have other stocks in *122 my possession which are worthless and have no value and that a list of such stocks is appended hereto. That my wife owns 25% in the stock of Wheel Service Corporation of Minneapolis. That such stock was in my name at one time but was conveyed to her in about 1930. That such stock has cost about $4,500 in cash. That my wife also owns one third interest in the stock of Flour City Body Corporation of Minneapolis, which she acquired in about 1930. That I paid about $1,000 of the cost of such stock and my wife $3,000 a total of $4,000. That my wife owns and operated in her own name a 1935 Cadillac Sedan, and that is fully paid for. That my wife, Reta Lee Banks, has both checking and savings accounts in the First National Bank of Minneapolis. That I own two lots located in Ardmore, Oklahoma, which I have never seen. That I have continued to pay the taxes on same, which amount to between $2.00 and $3.00 per year. That I took out a $10,000 life insurance policy in the Penn Mutual Life Insurance Company in 1926. That such policy now has a cash surrender value of approximately $2,500 against which I have borrowed $1,500. That I also have Government War Risk Insurance, secured by reason of my *123 service in the army, and on which I pay $196 per year as premiums. That I failed to pay the premiums for several years but understand same can still be reinstated. That I own Government Bonus bonds in the amount of $200, which I understand are exempt from attachment for government indebtedness. That I have no bank account in my name and no safety deposit box in my name other than the joint safety deposit box mentioned above. That I have no bank account and no safety deposit box in any other name. That I owe $2,000 to Harold Banks, Lexington, Nebraska, which I secured by giving my promissory note about January 1, 1934. That it is my opinion that I am actually insolvent at the present time. That the most I have ever been worth was $30,000 about 1920. That this affidavit is made for the purpose of disclosing my financial condition, in connection with offer in compromise filed by Peter Valder in July, 1937, to try and settle an assessment of $33,589.92 made in June, 1934. (Signed) Thos. W. Banks Subscribed and sworn to before me this, 2d day of July, 1937. (Signed) N. A. Park (N A Park), Notary Public Hennepin County, Minnesota, My. com. exp. 6/8/43 The list of stocks referred to in and *124 attached to said affidavit of Thomas William Banks is as follows: 60 shares Central Public Service
Worthless
300 shares American Eagle Air-
craft Corp.
Worthless
55 shares Corporation Securities
Co.
Worthless
300 shares Krueger & Toll Co
Worthless
52 shares Foote Bros. Gear &
Machinery Co.
Worthless
$1,000 par value bonds of American
Commonwealth Corp.
Worthless
Prior to submitting the affidavit to compromise petitioner's alcohol tax liability, petitioner's attorney, O'Gordon, explained to him that he would have to tell the Government about all of his assets, including all of his loans receivable. The statement in the affidavit that petitioner was actually "insolvent" originated with petitioner and O'Gordon accepted the statement as being the truth. Each item on said affidavit was examined separately by a revenue agent who made a field investigation to ascertain whether the item was correct. In the course of the investigation petitioner was personally questioned by a revenue agent to determine the authenticity of the affidavit. When Special Agent Peter V. Masica was assigned to investigate Banks for the taxable years 1937 through 1947, inclusive, he reviewed the previous investigations. He found that *125 an investigation of petitioner had been started in 1929 and that further work had been done in 1930 by various agents of the Internal Revenue Service. Masica conducted his investigation in cooperation with Revenue Agent Hanson. Hanson died several years prior to the instant trial. In the course of his investigation, Masica also reviewed the alcohol tax files relating to petitioner, including the aforesaid affidavit. He investigated various accounts and records of banks in Minneapolis, Minnesota, and talked to numerous people, including underworld characters, who might know something about petitioner's financial affairs. Also, Masica spoke to Kinsey, an accountant who did work for petitioner in connection with petitioner's prior income tax investigation involving the years 1920 through 1933. During the first interview, Kinsey told Masica that he had been engaged to prepare returns for all years for which petitioner might owe a tax and to work with the Federal agents in getting the facts straight. The information in connection with said returns never was produced by Kinsey. Kinsey told Masica at the time that it was very difficult to get any definite information from petitioner, that *126 petitioner had no records, and that he was unable to get any information regarding the alcohol operations. Petitioner had no records relating to income tax for the years 1920 through 1933. Kinsey furnished very little information to Masica regarding petitioner for the years 1920 to 1933, inclusive. The information furnished by Kinsey was only general and related to petitioner's investments in the Flour City Body Company and Wheel Service, two items in issue herein. Kinsey told Masica that he would try to locate any records relating to petitioner's interests in two bank accounts in the names of W. A. Arnold and Peter Allen, to be discussed infra. Kinsey never did furnish such records. On May 3, 1937, Kinsey promised to obtain information that might be available relating to the distribution of income from petitioner's bootlegging activities. Kinsey never furnished such information to Masica. As a result of the investigation of petitioner for the years 1920 to 1933, inclusive, Masica and Hanson prepared a net worth schedule of petitioner's assets and liabilities for the period involved. They personally investigated and checked into the assets and liabilities shown on the net worth schedule *127 of petitioner. On the basis of this net worth statement, deficiencies and additions to tax were determined against petitioner in the amount of $5,679.13. Under the provisions of Section 3176, Revised Statutes, as amended, on June 1, 1937, returns were prepared in the names of petitioner and his wife, Reta, for each of the years 1920 and 1923 through 1933, inclusive, and signed by the then deputy collector of internal revenue and filed with the collector for the district of Minnesota on September 20, 1937. On September 8, 1937, petitioner signed and submitted to the Internal Revenue Service a Form 870 waiving restrictions on assessment and collection of deficiencies and additions to tax determined against him for the years 1920 through 1933, inclusive. Said form was also signed by petitioner's wife. On April 2, 1946, Special Agent George McKusick began the investigation of petitioner for the taxable years ended December 31, 1937, through December 31, 1947, inclusive. (About five years later, in August 1951, McKusick completed his investigation and submitted his report.) McKusick began the investigation of petitioner by obtaining his returns from the revenue agents to whom they had been *128 assigned in a routine manner. Thereafter, investigators working with McKusick made inquiries of the banking houses where petitioner was rumored to have accounts. All of the sources of income on petitioner's Federal returns were surveyed to determine if there was any diversion from petitioner's ventures whereby he could receive money indirectly. The previous examination of petitioner by Masica and others, which ended in 1933 or 1934, was examined by McKusick. Then about eight special agents were divided into groups with instructions to go to banking houses and to examine the fronts and backs of every cashier's check, bank money order, and certified check which these banks handled. McKusick and others working on the case looked for both assets and liabilities for each year of the entire period involved herein. McKusick conducted an examination of numerous books and records of business places, banks, and various individuals engaged in commercial enterprises. He called on approximately 150 different business establishments to determine whether petitioner had an investment or interest in those ventures. Also, McKusick analyzed petitioner's Federal income tax returns and ascertained certain *129 investments of petitioner. He then requisitioned returns of these ventures and ascertained that Leonard Weinstock, a public accountant, had prepared them. Weinstock maintained the records or did accounting work for many enterprises, including Brady's Bar, The Blue Goose Resort, McCarthy's Cafe, Casablanca, Inc., B & S Company, Power Brake and Equipment Company, Casanova, Koolaire, and Tenth Street Realty Company, in some of which petitioner had a financial interest. Weinstock prepared the Federal income tax returns of petitioner and his wife from 1943 to the time of trial of the instant case. Two or three years after Weinstock began to prepare tax returns for petitioner he also started preparing tax returns for petitioner's partner, Harry Shepard. Following the investigation of petitioner, Weinstock made a voluntary disclosure for Shepard. Weinstock prepared and submitted a net worth statement for Shepard which included a recognition of an addition to tax for fraud up until the year 1950. The investigation of petitioner revealed that he used a lot of currency in his transactions and that many of his financial transactions were consummated without reference to any bank account whatsoever. *130 For example, petitioner would buy a cashier's check with currency, use currency or the cashier's check to buy property, sell the property, use the undeposited proceeds of the property to buy War Bonds, and later, cash the War Bonds to buy listed stocks. In the course of his investigation, McKusick never saw any personal books and records of petitioner, although he asked Weinstock about them. When McKusick inquired of Weinstock regarding petitioner's checking account, McKusick was given incomplete cancelled checks from certain bank accounts of petitioner. In each instance, some bank statements and checks were missing. On November 22, 1950, petitioner appointed O'Gordon as his attorney in fact to represent him before the Internal Revenue Service. On April 5, 1951, petitioner appointed Weinstock as his attorney in fact to represent him before the Internal Revenue Service. Thereafter, on June 21, 1951, petitioner appointed O'Gordon and John W. Graff to represent him as his attorneys in fact before the Internal Revenue Service. McKusick talked often to petitioner's attorney, O'Gordon, and asked him many questions. On June 4, 1951, McKusick met with petitioner in Weinstock's office and advised *131 petitioner that if he had an explanation for the tax deficiency he would be given an opportunity to come in and make his explanation. Petitioner never came in thereafter to make an explanation of his tax deficiency to McKusick. Special Agent McKusick died January 2, 1957. A ninety-day letter in the instant proceeding was issued on April 29, 1952, prior to commencement of the criminal trial against petitioner for income tax evasion. On January 14, 1952, a grand jury of the United States returned a criminal indictment against petitioner charging in three separate counts that under the provisions of Title 26, United States Code, Section 145(b), he wilfully and knowingly attempted to defeat and evade income tax due and owing by him to the United States for each of the years 1945, 1946, and 1947. Petitioner pleaded not guilty to each count of said indictment. During the resulting criminal trial before the United States District Court for the District of Minnesota, by use of the net worth plus non-deductible expenditures method, the Government offered evidence to show that petitioner had fraudulently understated his taxable net income and resulting Federal tax liability for each of the *132 years 1945, 1946, and 1947 in the respective amounts of: Understated
Understated
Year
Income
Tax
1945
$23,520.00
$15,044.06
1946
9,698.98
5,829.41
1947
20,843.78
12,067.55
In the criminal case, petitioner was represented by competent and experienced counsel. On May 30, 1952, the jury found petitioner guilty on all three counts of the indictment. United States v. Thomas W. Banks - F. 2d - F. Supp. (D. Minn. 1952). On June 23, 1952, petitioner was sentenced to three years in prison and fined $10,000. Ultimately said decision of the United States District Court involving Thomas was affirmed, Banks v. United States, 204 F. 2d 666 (C.A. 8, 1953), reaffirmed 223 F. 2d 884 (C.A. 8, 1955). Petition for certiorari denied 350 U.S. 986 (1956). The Pearson News Service, hereinafter referred to as Pearson, was a booking establishment where bets were placed on football, baseball, and basketball games. Petitioner was a 10 percent owner of Pearson and, in addition to having a proprietary interest therein, he also personally gambled there. The 318 Club, also known as the Kentucky Club, and the Social Club was a gambling establishment. It was located at 318 Nicollet, Minneapolis, Minnesota. Petitioner owned a *133 12 1/2 percent interest in the 318 Club. Petitioner and several individuals from California and Minneapolis opened a poker club in California during the period from 1937 to 1947. Coin-A-Matic Amusement Company, which appears on respondent's net worth schedule as an asset of petitioner, (Item 39) installed and operated pinball machines and Wurlitzer music boxes. Petitioner was engaged in this business with Harry Shepard. The following schedule is an analysis of the adjusted gross income reported by petitioner for the years 1937 to 1947, inclusive, on his Federal tax returns. The schedule shows the amounts and percentages of the reported adjusted gross income which were reported as "wagering" income and "miscellaneous" income: Misc. Income
Percentage
and Misc.
Total of
of Wagering
Total or
Fees and
Wagering
Misc. and
and Misc.
Adjusted
Year
Commissions
Income
Wagering
to Total
Gross Income
1937
$ 3,800.00
$ 3,800.00
66%
$ 5,725.86
1938
5,500.00
5,500.00
86%
6,383.96
1939
0
5,977.05
1940
$ 3,900.00
3,900.00
78%
4,985.77
1941
4,814.57
4,814.57
47%
5,471.31
1942
4,800.00
6,509.47
11,309.47
66%
17,125.33
1943
12,538.62
3,400.86
15,939.48
67%
23,471.66
1944
8,385.26
7,315.42
15,700.68
115%
13,707.62
1945
2,000.00
15,422.47
17,422.47
83%
21,113.69
1946
2,000.00
23,829.24
25,829.24
81%
31,849.27
1947
2,000.00
16,463.24
18,463.24
74%
24,876.25
Totals
$41,023.88
$81,655.27
$122,679.15
$165,502.34
Percentage of
25%
49%
74%
100%
total or
adjusted gross
income
Petitioner's *134 returns for the years 1937 to 1947, inclusive, do not reveal the sources of his gambling income. Petitioner's gambling income was referred to on said returns as "wagering - joint winnings," "wagering - personal winnings," "miscellaneous income, " "wagering-baseball book," "wagering - other," "miscellaneous income fees and commissions," and similar designations. All such designations originated with petitioner personally and not with the accountants who prepared his returns. Petitioner would pick a round figure and insert the amount in his income tax return describing it as "miscellaneous" income or by one of the other aforesaid terms. At the end of each year, what purported to be petitioner's gambling income was given to his accountant, Weinstock, as a lump sum figure. No details of petitioner's gambling income was given to his accountant who had no idea of the source of the income. The only records of petitioner's gambling income which were kept by Weinstock consisted of slips of adding machine tape that petitioner gave to him containing notations of his gambling receipts. Weinstock made no effort to audit or verify said information. A meeting was held in the office of the Internal *135 Revenue Service on August 22, 1950, in St. Paul. In attendance at the meeting were petitioner, his attorneys, O'Gordon and Meshbesher, Arthur A. Stone, then Head of the Intelligence Unit, Special Agents Walter Thomas and George McKusick. The purpose of this meeting was to discuss questions which were to be submitted to petitioner. As a result of this meeting certain questions were prepared by McKusick and were submitted in writing under date of December 12, 1950, to O'Gordon. On February 1, 1951, O'Gordon, using his stationery, submitted answers to said questions to McKusick. Petitioner discussed said questions with Weinstock at the latter's office on several occasions and with O'Gordon a number of times. O'Gordon attempted to obtain the answers from petitioner to several questions which were left unanswered. O'Gordon followed petitioner's instructions in such matters. Respondent's net worth schedule does not contain a detailed itemization of assets and liabilities for the period beginning December 31, 1936, and ending December 31, 1941, because the books and records required to establish the details were not available. The amount of income received by petitioner during each of the *136 years from 1937 to 1941, inclusive, was determined by a process of allocation. The net worth of petitioner was determined as of December 31, 1936, and again as of December 31, 1941. The increase in net worth determined for said period ($40,146.47) was allocated equally to the five intervening years from December 31, 1936, to December 31, 1941. The additional income as found in the revenue agent's findings for the years 1938 through 1940 ($5,688.49) was eliminated from the increase of net income from December 31, 1936 to December 31, 1941. For an understandable presentation of the issues of fact and law to be considered infra, it is essential at this point to set forth the following schedules: Schedule A represents our reconstruction of respondent's amended computations of increase in net worth for the five-year period beginning December 31, 1936, and ending December 31, 1941, and for the years 1942 to 1947, inclusive. Schedule B submitted by respondent represents a supplemental net worth computation showing an allocation of unreported income for the years 1937 to 1941, inclusive. Items on Schedule A which have been admitted in the pleadings, conceded at the trial, or on brief, are *137 indicated by the letter "c." Items which have been stipulated orally by the parties at the trial are indicated by the letters "o s." Items conceded and corrected by respondent by written stipulation are indicated by letters "w s." Schedule C represents our revision of increases in net worth for the same periods and the ultimate resulting understatements. Disputed items are indicated by the letter "d." Items without designation are either stipulated, conceded, or uncontested. Schedule A
Net Worth - Thomas W. Banks
Item
ASSETS
12-31-36
12-31-41
12-31-42
12-31-43
1.
Marquette Nat.
$ 63.39
$ 637.49
$ 1,373.90
Bank-Minneapolis
2.
First Nat. Bank
$ 159.15
301.49
374.60
1,058.05
Minneapolis
3.
First Nat. Bank Anoka,
492.98
347.88
Minn.
4.
Grand Marais State Bank,
Grand Marais,
Minn.
175.00
5.
Jamieson & Co. check
6.
Series D bonds
562.50
562.50
562.50
7.
Series E bonds
375.00
7,537.50
7A.
Bonus bond
200.00
8.
Merchants Distilling
stock
9.
Gillette Safety Razor
stock
10.
Northwest Airlines stock
10A.
Mohawk Liquor Corp.
750.00
750.00
750.00
stock
10B.
Insull Utilities
3,497.40
10C.
Cities Service stock
2,819.53
2,819.53
2,819.53
2,819.53
Receivables
10D.
Rubin Shetsky
11.
H. G. Lee
12.
M. J. O'Connor note
13.
Quality Drug Co.
14.
T. E. Ewing
15.
Ring Construction Co.
16.
F. J. Wickers
17.
Robert L. Schuettler
18.
A. M. Cary
19.
Harold Siegel & Howard
Gelb
20.
Walter Halvorson
1,325.00
21.
Brady's Bar
(6,934.42)
(7,434.42)
9,240.10
22.
Pearson's News Service
(998.15)
(438.00)
1,610.00
23.
Blue Goose Resort, Inc.
(2,420.00)
10,469.45
24.
McCarthy's Cafe
25.
Flour City Body Corp.
25A.
Casablanca, Inc.
26.
Daily Mail
26A.
E. A. Jefferds
5,000.00
Anoka Farms
27.
Inventory
745.00
9,128.32
12,692.10
28.
Bldgs. and Improvements
6,400.00
17,176.36
19,726.36
- Main Farm
29.
Equipment - Main Farm
9,259.75
9,259.75
30.
Land - Main Farm
3,830.35
3,830.35
5,130.35
31.
Bldgs. - #2 Farm (Wm.
Hesli) (w.s.)
32.
Land - #2 Farm
33.
Bldgs. - #3 Farm (Lyle
G. Nichols)
34.
Land - #3 Farm
35.
Twin City Milk Producers
110.00
165.00
Assn. (w.s.)
36.
Mortgages
(4,394.75)
(4,230.46)
(4,059.53)
37.
Reserve for Depreciation
(532.00)
(1,951.86)
(3,422.72)
- Bldgs. & Equipt.
Investment in Operating
Companies
38.
Banks and Shepard
4,679.77
6,796.96
8,677.83
39.
Coin-A-Matic Amusement
5,192.26
4,156.46
6,140.77
Co.
40.
McCarthy's Cafe, Inc.
7,364.14
11,864.14
41.
B & S Company (o.s.)
3,400.00
42.
Flour City Body Corp.
4,000.00
4,000.00
4,000.00
4,000.00
43.
Power Brake & Equipment
Co.
44.
Blue Goose Resort, Inc.
7,125.00
7,125.00
7,125.00
44A.
Wheel Service
4,500.00
45.
10th St. Realty Co.
45A.
Casablanca (o.s.)
7,800.00
46.
Budweiser Tavern Bldg.
3,171.50
3,025.43
47.
Pearson News Service
2,948.65
6,043.81
2,951.67
48.
Music Installations
1,775.00
1,775.00
1,775.00
49.
Koolaire, Inc.
50.
National Plastics
Other Real Estate
51.
3817 Drew Ave. (Personal
13,500.00
13,500.00
13,500.00
13,500.00
Residence)
52.
3952 Beard Ave.
640.50
5,705.62
5,524.37
5,343.12
53.
4400 East Lake Street
2,100.00
2,100.00
2,100.00
54.
5238 Excelsior Blvd.
2,380.22
10,724.03
10,369.15
55.
Oneida Bldg.
295.12
56.
Crow Wing County Land
1,000.00
3,600.00
3,600.00
3,600.00
57.
Hungry Jack Lodge (o.s.)
Total Assets
$36,078.58
$55,619.46
$104,923.41
$173,727.45
LIABILITIES
Mortgages Payable
58.
3817 Drew Ave. So.
$ 5,852.46
$ 2,075.98
$ 2,066.73
$1,187.87
(w.s.)
59.
3952 Beard Ave.
3,500.00
2,120.00
1,640.00
1,160.00
60.
4400 East Lake Street
1,700.00
1,700.00
1,700.00
61.
5238 Excelsior Blvd.
5,939.09
5,190.40
62.
Oneida Bldg.
Loans and Accts. Payable
62A.
Penn Mutual Life Ins.
1,500.00
Co.
63.
Harold H. Banks
2,000.00
2,000.00
2,000.00
2,000.00
64.
Marquette Nat. Bank
4,500.00
3,500.00
65.
First Nat. Bank Anoka,
1,000.00
Minn.
66.
Flour City Body Corp.
38.47
2,968.58
3,484.66
(w.s.)
67.
Accts. receivable per
2,816.13
424.58
322.29
corporate books
68.
Notes receivable per
1,500.00
1,500.00
corporate books (w.s.)
Total Liabilities
$12,852.46
$15,250.58
$ 22,738.98
$ 16,545.22
TOTAL ASSETS
$36,078.58
$55,619.46
$104,923.41
$173,727.45
Less: Total Liabilities
12,852.46
15,250.58
22,738.98
16,545.22
NET WORTH
$23,226.12
$40,368.88
$ 82,184.43
$157,182.23
Less: Net Worth at
23,226.12
40,368.88
82,184.43
beginning of year or
period
Increase in Net Worth
$17,142.76
$ 41,815.55
$ 74,997.80
(see a below)
Less: Nontaxable income
Increase in Net Worth
a
Less: Nontaxable income
$17,142.76
$ 41,815.55
$ 74,997.80
Plus: Living Expenses
10,000.00
10,000.00
Federal Income Taxes
267.66
17,366.35
Paid
Corrected Net Income of
$ 52,083.21
$102,364.15
Thomas W. Banks & Reta
Banks
Less: Net income
464.65
478.63
reported by Reta b
Corrected net income of
$ 51,618.56
$101,885.52
Thomas W. Banks
Less: Net income
14,415.92
21,307.01
reported by Thomas W.
Banks
Unreported Net Income
$ 37,202.64
$ 80,578.51
*138 Schedule A
Net Worth - Thomas W. Banks
Item
ASSETS
12-31-44
12-31-45
12-31-46
12-31-47
1.
Marquette Nat.
$ 899.45
$ 2,461.65
$ 2,177.79
$ 2,985.77
Bank-Minneapolis
2.
First Nat. Bank
2,704.08
11,253.84
686.65
3,129.43
Minneapolis
3.
First Nat. Bank Anoka,
1,004.38
1,365.20
2,558.57
1,788.88
Minn.
4.
Grand Marais State Bank,
Grand Marais,
Minn.
476.95
781.95
1,114.25
825.67
5.
Jamieson & Co. check
2,488.74
6.
Series D bonds
562.50
562.50
7.
Series E bonds
19,162.50
23,662.50
18.75
18.75
7A.
Bonus bond
8.
Merchants Distilling
9,380.91
stock
9.
Gillette Safety Razor
14,349.04
stock
10.
Northwest Airlines stock
22,019.29
28,957.29
10A.
Mohawk Liquor Corp.
750.00
750.00
stock
10B.
Insull Utilities
10C.
Cities Service stock
2,819.53
2,819.53
2,819.53
2,819.53
Receivables
10D.
Rubin Shetsky
5,000.00
5,000.00
5,000.00
11.
H. G. Lee
5,000.00
5,000.00
5,000.00
12.
M. J. O'Connor note
3,000.00
13.
Quality Drug Co.
2,500.00
3,750.00
3,750.00
3,750.00
14.
T. E. Ewing
10,000.00
10,000.00
10,000.00
10,000.00
15.
Ring Construction Co.
2,000.00
16.
F. J. Wickers
4,000.00
4,500.00
17.
Robert L. Schuettler
10,000.00
18.
A. M. Cary
12,500.00
19.
Harold Siegel & Howard
32,358.33
Gelb
20.
Walter Halvorson
1,025.00
725.00
400.00
200.00
21.
Brady's Bar
22.
Pearson's News Service
410.00
200.00
23.
Blue Goose Resort, Inc.
16,514.82
9,477.02
(1,488.13)
511.87
24.
McCarthy's Cafe
3,500.00
3,500.00
13,500.00
26,000.00
25.
Flour City Body Corp.
2,500.00
5,000.00
2,750.00
2,750.00
25A.
Casablanca, Inc.
11,600.00
11,600.00
11,600.00
26.
Daily Mail
10,000.00
26A.
E. A. Jefferds
5,000.00
5,000.00
5,000.00
5,000.00
Anoka Farms
27.
Inventory
16,922.01
16,284.25
16,389.50
20,907.01
28.
Bldgs. and Improvements
21,497.27
22,750.19
24,840.75
24,974.60
- Main Farm
29.
Equipment - Main Farm
11,715.71
11,715.71
16,848.12
18,764.60
30.
Land - Main Farm
5,130.35
5,130.35
9,880.35
9,880.35
31.
Bldgs. - #2 Farm (Wm.
2,000.00
2,218.59
4,599.74
Hesli) (w.s.)
32.
Land - #2 Farm
3,200.00
3,365.00
3,365.00
33.
Bldgs. - #3 Farm (Lyle
1,800.00
1,800.00
G. Nichols)
34.
Land - #3 Farm
4,240.00
4,240.00
35.
Twin City Milk Producers
165.00
165.00
165.00
165.00
Assn. (w.s.)
36.
Mortgages
(1,072.18)
(990.15)
37.
Reserve for Depreciation
(5,102.79)
(7,015.28)
(9,081.25)
(12,235.14)
- Bldgs. & Equipt.
Investment in Operating
Companies
38.
Banks and Shepard
7,884.56
9,258.95
8,219.03
9,038.14
39.
Coin-A-Matic Amusement
6,894.85
8,058.53
8,862.45
7,505.72
Co.
40.
McCarthy's Cafe, Inc.
11,864.11
11,864.14
11,864.14
11,864.14
41.
B & S Company (o.s.)
8,849.33
8,849.33
8,849.33
8,849.33
42.
Flour City Body Corp.
4,000.00
4,000.00
4,000.00
4,000.00
43.
Power Brake & Equipment
3,750.00
3,750.00
Co.
44.
Blue Goose Resort, Inc.
7,125.00
7,125.00
7,125.00
7,125.00
44A.
Wheel Service
45.
10th St. Realty Co.
9,925.00
14,603.00
45A.
Casablanca (o.s.)
7,800.00
7,800.00
7,800.00
7,800.00
46.
Budweiser Tavern Bldg.
3,408.40
3,378.30
3,717.29
3,628.10
47.
Pearson News Service
5,200.79
11,408.01
24,667.35
5,765.24
48.
Music Installations
1,775.00
1,775.00
1,775.00
1,775.00
49.
Koolaire, Inc.
18,200.00
50.
National Plastics
8,125.00
Other Real Estate
51.
3817 Drew Ave. (Personal
13,500.00
13,500.00
13,500.00
13,500.00
Residence)
52.
3952 Beard Ave.
53.
4400 East Lake Street
2,100.00
2,100.00
2,100.00
2,100.00
54.
5238 Excelsior Blvd.
10,696.87
1,000.00
1,000.00
1,000.00
19,650.00
20,862.71
20,422.62
55.
Oneida Bldg.
295.12
375.12
375.12
446.65
56.
Crow Wing County Land
3,600.00
3,600.00
3,600.00
3,600.00
57.
Hungry Jack Lodge (o.s.)
Total Assets
$244,800.82
$302,038.79
$330,871.82
$350,297.34
LIABILITIES
Mortgages Payable
58.
3817 Drew Ave. So.
(w.s.)
59.
3952 Beard Ave.
60.
4400 East Lake Street
$ 1,700.00
$ 1,700.00
61.
5238 Excelsior Blvd.
62.
Oneida Bldg.
6,000.00
5,400.00
$ 4,800.00
Loans and Accts. Payable
62A.
Penn Mutual Life Ins.
Co.
63.
Harold H. Banks
64.
Marquette Nat. Bank
65.
First Nat. Bank Anoka,
Minn.
66.
Flour City Body Corp.
3,484.66
3,484.66
2,284.66
$ (462.62)
(w.s.)
67.
Accts. receivable per
corporate books
68.
Notes receivable per
1,500.00
1,500.00
1,500.00
1,500.00
corporate books (w.s.)
Total Liabilities
$12,684.66
$ 12,084.66
$ 8,584.66
$ 1,037.38
TOTAL ASSETS
$244,800.82
$302,038.79
$330,871.82
$350,297.34
Less: Total Liabilities
12,684.66
12,084.66
8,584.66
1,037.38
NET WORTH
$232,116.16
$289,954.13
$322,287.16
$349,259.96
Less: Net Worth at
157,182.33
232,116.16
289,954.13
322,287.16
beginning of year or
period
Increase in Net Worth
$ 74,933.93
$ 57,837.97
$ 32,333.03
$ 26,972.80
(see a below)
Less: Nontaxable income
1,653.97
2,352.47
2,292.23
95.78
Increase in Net Worth
Less: Nontaxable income
$ 73,279.96
$ 55,485.50
$ 30,040.80
$ 26,877.02
Plus: Living Expenses
10,000.00
10,000.00
12,000.00
12,000.00
Federal Income Taxes
3,639.71
131.17
5,482.44
9,565.66
Paid
Corrected Net Income of
$ 86,919.67
$ 65,616.67
$ 47,523.24
$ 48,442.68
Thomas W. Banks & Reta
Banks
Less: Net income
1,030.68
1,374.38
948.40
352.42
reported by Reta b
Corrected net income of
$ 85,888.99
$ 64,242.29
$ 46,574.84
$ 48,090.26
Thomas W. Banks
Less: Net income
11,858.28
20,170.11
27,100.99
20,609.29
reported by Thomas W.
Banks
Unreported Net Income
$ 74,030.71
$ 44,072.18
$ 19,473.85
$ 27,480.97
*139 SCHEDULE B
SUPPLEMENTARY NET WORTH COMPUTATION
Showing Allocation of Unreported Net Income
for Years of 1937 to 1941, inclusive
Unreported Net Income for period 12-31-36 to 12-31-41, inclusive
$45,834.96 Less: Additional Net Income per prior determinations: Net Income Per
Net Income Per
Additional
Prior Deter-
Original
Net In-
Year
mination
Return
come
1938
$7,104.89
$5,400.35
$1,704.54
1939
8,018.67
4,853.04
3,165.63
1940
4,253.70
3,435.38
818.32
5,688.49
Unreported Net Income in excess of prior determinations
$40,146.47
Allocation of Unreported Net Income in excess of prior
$ 8,029.29
determinations on an equal basis for each year: $40,146.47 / 5 =
*140 Computation of Corrected Net Income: Net Income Per
Additional Per
Additional Allo-
Corrected
Original
Prior Deter-
cated Unre-
Net In-
Year
Return
mination
ported
come
1937
$ 4,879.91
$ 8,029.30
$12,909.11
1938
5,400.35
$1,704.54
8,029.30
15,134.19
1939
4,853.04
3,165.63
8,029.29
16,047.96
1940
3,435.38
818.32
8,029.29
12,282.99
1941
4,008.56
8,029.29
12,037.85
Totals
$22,577.14
$5,688.49
$40,146.47
$68,412.10
SCHEDULE C
Net Worth - Thomas W. Banks
Item
ASSETS
12-31-36
12-31-41
12-31-42
12-31-43
A.
Cash on Hand nd
$ 60,000.00
$ 60,000.00
$ 60,000.00
$ 60,000.00
1.
Marquette Natl. Bk.,
63.39
637.49
1,373.90
Minneapolis
2.
1st Natl. Bk.,
159.15
301.49
374.60
1,058.05
Minneapolis
3.
1st Natl. Bk., Anoka,
492.98
347.88
Minn
4.
Grand Marais State Bk.,
Grand Marais,
Minn.
175.00
5.
Jamieson & Co. check
6.
Series D Bonds
562.50
562.50
562.50
7.
Series E Bonds
375.00
7,537.50
7A.
Bonus Bond
200.00
8.
Merchant's Distilling
Stock
9.
Gillette Safety Razor
Stock
10.
Northwest Airlines
Stock
10A.
Mohawk Liquor Corp.
750.00
750.00
750.00
Stock nd
10B.
Insull Utilities
3,497.40
Investment nd
10BB.
Old Peoria Co., Inc. nd
12,500.00
10C.
Cities Service Stock
2,819.53
2,819.53
2,819.53
2,819.53
Receivables
10D.
Rubin Shetsky (See
Living Expenses
below) nd
11.
H. G. Lee nd
12.
M. J. O'Connor Note
13.
Quality Drug Co.
14.
T. E. Ewing nd
15.
Ring Construction Co.
16.
F. J. Wickers
17.
Robert L. Schuettler
18.
A. M. Cary
19.
Harold Siegel and
Howard Gelb nd
20.
Walter Halvorson
1,325.00
21.
Brady's Bar nd
(6,934.42)
(7,434.42)
9,240.10
22.
Pearson's News Service
(998.15)
(438.00)
1,610.00
23.
Blue Goose Resort, Inc.
(2,420.00)
10,469.45
24.
McCarthy's Cafe
25.
Flour City Body Corp.
25A.
Casablanca, Inc.
26.
Daily Mail nd
26A.
E. A. Jefferds nd
5,000.00
Anoka Farms
27.
Inventory nd
$ 745.00
$ 9,128.32
$ 12,692.10
28.
Buildings &
6,400.00
17,176.36
19,726.36
Improvements - Main
Farm nd
29.
Equipment - Main Farm
9,259.75
9,259.75
nd
30.
Land - Main Farm nd
3,830.35
3,830.35
5,130.35
31.
Buildings - #2 Farm
(Wm. Hesli) nd
32.
Land - #2 Farm nd
33.
Buildings - #3 Farm
(Lyle G. Nichols) nd
34.
Land - #3 Farm nd
35.
Twin City Milk
110.00
165.00
Producers Assn. nd
36.
Mortgages nd
(4,394.75)
(4,230.46)
(4,059.53)
37.
Reserve for
Depreciation -
Buildings &
Equipment nd
(532.00)
(1,951.86)
(3,422.72)
Investment in Operating
Companies
38.
Banks and Shepard
4,679.77
6,796.96
8,677.83
39.
Coin-A-Matic Amusement
5,192.26
4,156.46
6,140.77
Co.
40.
McCarthy's Cafe, Inc.
7,364.14
11,864.14
41.
B & S Company
3,400.00
42.
Flour City Body
$ 4,000.00
4,000.00
4,000.00
4,000.00
Corporation nd
43.
Power Brake & Equipment
Co.
44.
Blue Goose Resort, Inc.
7,125.00
7,125.00
7,125.00
44A.
Wheel Service nd
4,500
45.
10th Street Realty Co.
45A.
Casablanca
7,800.00
46.
Budweiser Tavern Bldg.
3,171.50
3,025.43
47.
Pearson's News Service
2,948.65
6,043.81
2,951.67
48.
Music Installations
1,775.00
1,775.00
49.
Koolaire, Inc.
50.
National Plastics
Other Real Estate
51.
3817 Drew Ave.
13,500.00
13,500.00
13,500.00
13,500.00
(Personal Residence)
52.
3952 Beard Ave.
6,402.50
5,705.62
5,524.37
5,343.12
53.
4400 East Lake Street
2,100.00
2,100.00
2,100.00
54.
5238 Excelsior Blvd.
2,380.22
10,724.03
10,369.15
55.
Oneida Building
56.
Crow Wing County Land
295.12
57.
Hungry Jack Lodge nd
1,000.00
3,600.00
3,600.00
3,600.00
TOTAL ASSETS
$108,578.58
$115,619.46
$164,923.41
$236,858.45
LIABILITIES
Mortgages Payable
58.
3817 Drew Ave.
$ 5,852.46
$ 2,075.98
$ 2,066.73
$ 1,187.87
59.
3952 Beard Ave.
3,500.00
2,120.00
1,640.00
1,160.00
60.
4400 East Lake St.
1,700.00
1,700.00
1,700.00
61.
5238 Excelsior Blvd.
5,939.09
5,190.40
62.
Oneida Bldg.
Loans and Accounts
Payable
62A.
Penn Mutual Life
1,500.00
Insurance Co.
63.
Harold H. Banks
2,000.00
2,000.00
2,000.00
2,000.00
64.
Marquette Natl. Bank
4,500.00
3,500.00
65.
1st Natl. Bk., Anoka,
1,000.00
Minn
66.
Flour City Body Corp.
(Officers' ad-
vances per corporate
38.47
2,968.58
3,484.66
books)
67.
Accts. Receivable per
2,816.13
424.58
322.29
corporate books
68.
Notes Receivable per
1,500.00
1,500.00
corporate books
TOTAL LIABILITIES
$ 12,852.46
$ 15,250.58
$ 22,738.98
$ 16,545.22
Total Assets
$108,578.58
$115,619.46
$164,923.41
$236,858.45
Less: Total Liabilities
12,852.46
15,250.58
22,738.98
16,545.22
Net Worth
$ 95,726.12
$100,368.88
$142,184.43
$220,313.23
Less: Net Worth at
beginning of yr. or
period
95,726.12
100,368.88
142,184.43
Increase in Net Worth
$ 4,642.76
$ 41,815.55
$ 78,128.80
Less: Nontaxable Income
Increase in Net Worth
$ 4,642.76
$ 41,815.55
$ 78,128.80
1/5 of Net Worth
Increase allocated to
1941
(See Resp's. Schedule
919.05
B)
Plus: Living Expenses
6,000.00
10,000.00
10,000.00
Rubin Shetsky
Fed. Income Taxes pd.
254.11
267.66
17,366.35
by petitioner
Corrected Net Income of
Thomas W. & Reta
Banks
$ 7,173.16
$ 52,083.21
$105,495.15
Less: Net Income
236.43
464.65
478.63
reported by Reta
Corrected Net Income of
$ 6,936.73
$ 51,618.56
$105,016.52
Thomas
Less: Net Income
4,008.56
14,415.92
21,307.01
reported by Thomas
UNREPORTED NET INCOME
$ 2,928.17
$ 37,202.64
$ 83,709.51
*141 SCHEDULE C
Net Worth - Thomas W. Banks
Item
ASSETS
12-31-44
12-31-45
12-31-46
12-31-47
A.
Cash on Hand nd
$ 60,000.00
$ 60,000.00
$ 60,000.00
$ 60,000.00
1.
Marquette Natl. Bk.,
899.45
2,461.65
2,177.79
2,985.77
Minneapolis
2.
1st Natl. Bk.,
2,704.08
11,253.84
686.65
3,129.43
Minneapolis
3.
1st Natl. Bk., Anoka,
1,004.38
1,365.20
2,558.57
1,788.88
Minn
4.
Grand Marais State Bk.,
Grand Marais,
Minn.
476.95
781.95
1,114.25
825.67
5.
Jamieson & Co. check
2,488.74
6.
Series D Bonds
562.50
562.50
7.
Series E Bonds
19,162.50
23,662.50
18.75
18.75
7A.
Bonus Bond
8.
Merchant's Distilling
9,380.91
Stock
9.
Gillette Safety Razor
14,349.04
Stock
10.
Northwest Airlines
22,019.29
28,957.29
Stock
10A.
Mohawk Liquor Corp.
750.00
750.00
Stock nd
10B.
Insull Utilities
Investment nd
10BB.
Old Peoria Co., Inc. nd
10C.
Cities Service Stock
2,819.53
2,819.53
2,819.53
2,819.53
Receivables
10D.
Rubin Shetsky (See
Living Expenses
below) nd
11.
H. G. Lee nd
5,000.00
5,000.00
5,000.00
12.
M. J. O'Connor Note
3,000.00
13.
Quality Drug Co.
2,500.00
3,750.00
3,750.00
3,750.00
14.
T. E. Ewing nd
10,000.00
10,000.00
10,000.00
10,000.00
15.
Ring Construction Co.
2,000.00
16.
F. J. Wickers
4,000.00
4,500.00
17.
Robert L. Schuettler
10,000.00
18.
A. M. Cary
12,500.00
19.
Harold Siegel and
32,358.33
Howard Gelb nd
20.
Walter Halvorson
1,025.00
725.00
400.00
200.00
21.
Brady's Bar nd
22.
Pearson's News Service
410.00
200.00
23.
Blue Goose Resort, Inc.
16,514.82
9,477.02
(1,488.13)
511.87
24.
McCarthy's Cafe
3,500.00
3,500.00
13,500.00
26,000.00
25.
Flour City Body Corp.
2,500.00
5,000.00
2,750.00
2,750.00
25A.
Casablanca, Inc.
11,600.00
11,600.00
11,600.00
26.
Daily Mail nd
5,000.00
26A.
E. A. Jefferds nd
5,000.00
5,000.00
5,000.00
5,000.00
Anoka Farms
27.
Inventory nd
$ 16,922.01
$ 16,284.25
$ 16,389.50
$ 20,907.01
28.
Buildings &
21,497.27
22,750.19
24,840.75
24,974.60
Improvements - Main
Farm nd
29.
Equipment - Main Farm
11,715.71
11,715.71
16,848.12
18,764.60
nd
30.
Land - Main Farm nd
5,130.35
5,130.35
9,880.35
9,880.35
31.
Buildings - #2 Farm
2,000.00
2,218.59
4,599.74
(Wm. Hesli) nd
32.
Land - #2 Farm nd
3,200.00
3,365.00
3,365.00
33.
Buildings - #3 Farm
1,800.00
1,800.00
(Lyle G. Nichols) nd
34.
Land - #3 Farm nd
4,240.00
4,240.00
35.
Twin City Milk
165.00
165.00
165.00
165.00
Producers Assn. nd
36.
Mortgages nd
(1,072.18)
(990.15)
37.
Reserve for
Depreciation -
Buildings &
Equipment nd
(5,102.79)
(7,015.28)
(9,081.25)
(12,235.14)
Investment in Operating
Companies
38.
Banks and Shepard
7,884.56
9,258.95
8,219.03
9,038.14
39.
Coin-A-Matic Amusement
6,894.85
8,058.53
8,862.45
7,505.72
Co.
40.
McCarthy's Cafe, Inc.
11,864.14
11,864.14
11,864.14
11,864.14
41.
B & S Company
8,849.33
8,849.33
8,849.33
8,849.33
42.
Flour City Body
4,000.00
4,000.00
4,000.00
4,000.00
Corporation nd
43.
Power Brake & Equipment
3,750.00
3,750.00
Co.
44.
Blue Goose Resort, Inc.
7,125.00
7,125.00
7,125.00
7,125.00
44A.
Wheel Service nd
45.
10th Street Realty Co.
9,925.00
14,603.00
45A.
Casablanca
7,800.00
7,800.00
7,800.00
7,800.00
46.
Budweiser Tavern Bldg.
3,408.40
3,378.30
3,717.29
3,628.10
47.
Pearson's News Service
5,200.79
11,408.01
24,667.35
5,765.24
48.
Music Installations
1,775.00
1,775.00
1,775.00
1,775.00
49.
Koolaire, Inc.
18,200.00
50.
National Plastics
8,125.00
Other Real Estate
51.
3817 Drew Ave.
13,500.00
13,500.00
13,500.00
13,500.00
(Personal Residence)
52.
3952 Beard Ave.
53.
4400 East Lake Street
2,100.00
2,100.00
2,100.00
2,100.00
54.
5238 Excelsior Blvd.
10,696.87
1,000.00
1,000.00
1,000.00
55.
Oneida Building
19,650.00
20,862.71
20,422.62
56.
Crow Wing County Land
295.12
375.12
375.12
446.65
57.
Hungry Jack Lodge nd
3,600.00
3,600.00
3,600.00
3,600.00
TOTAL ASSETS
$304,800.82
$357,038.79
$385,871.82
$400,297.34
LIABILITIES
Mortgages Payable
58.
3817 Drew Ave.
59.
3952 Beard Ave.
60.
4400 East Lake St.
$ 1,700.00
$ 1,700.00
61.
5238 Excelsior Blvd.
62.
Oneida Bldg.
6,000.00
5,400.00
$ 4,800.00
Loans and Accounts
Payable
62A.
Penn Mutual Life
Insurance Co.
63.
Harold H. Banks
64.
Marquette Natl. Bank
65.
1st Natl. Bk., Anoka,
Minn
66.
Flour City Body Corp.
(Officers' ad-
vances per corporate
3,484.66
3,484.66
2,284.66
$ (462.62)
books)
67.
Accts. Receivable per
corporate books
68.
Notes Receivable per
1,500.00
1,500.00
1,500.00
1,500.00
corporate books
TOTAL LIABILITIES
$ 12,684.66
$ 12,084.66
$ 8,584.66
$ 1,037.38
Total Assets
$304,800.82
$357,038.79
$385,871.82
$400,297.34
Less: Total Liabilities
12,684.66
12,084.66
8,584.66
1,037.38
Net Worth
$292,116.16
$344,954.13
$377,287.16
$399,259.96
Less: Net Worth at
beginning of yr. or
period
220,313.23
292,116.16
344,954.13
377,287.16
Increase in Net Worth
$ 71,802.93
$ 52,837.97
$ 32,333.03
$ 21,972.80
Less: Nontaxable Income
1,653.97
2,352.47
2,292.23
95.78
Increase in Net Worth
$ 70,148.96
$ 50,485.50
$ 30,040.80
$ 21,877.02
1/5 of Net Worth
Increase allocated to
1941
(See Resp's. Schedule
B)
Plus: Living Expenses
10,000.00
10,000.00
12,000.00
12,000.00
Rubin Shetsky
5,000.00
Fed. Income Taxes pd.
3,639.71
131.17
5,482.44
9,565.66
by petitioner
Corrected Net Income of
Thomas W. & Reta
Banks
$ 83,788.67
$ 65,616.67
$ 47,523.24
$ 48,442.68
Less: Net Income
1,030.68
1,374.38
948.40
352.42
reported by Reta
Corrected Net Income of
$ 82,757.99
$ 64,242.29
$ 46,574.84
$ 48,090.26
Thomas
Less: Net Income
11,858.28
20,170.11
27,100.99
20,609.29
reported by Thomas
UNREPORTED NET INCOME
$ 70,899.71
$ 44,072.18
$ 19,473.85
$ 27,480.97
*142 Where a contested item raises an issue of fact, we resolve the issue in our findings relating thereto, with further explanation in our opinion to the extent that elaboration of the basis of our ultimate findings seems required. Where the contested item involves the burden of proof, we likewise explain our view in our opinion. Our findings of fact and opinion with respect to disputed items will be set forth hereinafter in the order in which they appear on our revised net worth Schedule C, supra. In several instances, however, where petitioner contends that respondent erroneously omitted certain assets or liabilities, we resolve the issue in the appropriate relationship to other disputed items. Opinion Net Worth Method At the threshold of our discussion, we note that petitioner's counsel conceded at the trial that respondent was justified in resorting to the comparative net worth plus gross expenditures method in reconstructing petitioner's taxable income during the years ending December 31, 1936, through December 31, 1947, inclusive. Petitioner's primary objection, however, is to the effect that the net worth method, when properly applied to the facts of record, establishes that petitioner *143 fully reported his taxable income for the years in controversy. Apart from petitioner's concession hereinabove, we note, for clarity, the courts have repeatedly held that the net worth method is not a method of accounting, and may be used as a guide for determining the amount of income actually received where the net worth computation reveals a substantial gap between actual income and reported income, or where the books or other records are, as here, shown to have been inadequately maintained or destroyed. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932; Carmack v. Commissioner, 183 F. 2d 1, (C.A. 5, 1950), affirming a Memorandum Opinion of this Court, certiorari denied 340 U.S. 875 (1950); Frank Imburgia, 22 T.C. 1002 (1954). By a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancies being attributable to gifts, inheritances, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. Harry Gleis, 24 T.C. 941 (1955), affd. 245 F. 2d 237 *144 (C.A. 6, 1957); Michael Potson, 22 T.C. 912 (1954), affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). In our analysis of the record we need not, therefore, restrict the use of the net worth method to finding particular inaccuracies, omissions, or defalcations in the taxpayer's books. Such may or may not exist and may or may not be discernible. Banks v. United States, 204 F. 2d 666 (C.A. 8, 1953), reaffirmed on reconsideration, 223 F. 2d 884 (C.A. 8, 1955), certiorari denied 350 U.S. 986 (1956). It is well settled that petitioner has the burden of establishing by a preponderance of the evidence that respondent's reconstruction of income is erroneous, and this extends to his determination of net worth at the beginning of the critical period. Of course, the burden of proving increases in deficiencies and additions to tax, affirmatively alleged by amended answer, and the entire burden of proving fraud, rests on respondent. Joseph V. Moriarity, 18 T.C. 327, 329 (1952), affd. per curiam 208 F. 2d 43 (C.A.D.C. 1953). We reject petitioner's contention that certain errors in respondent's beginning and ending net worth computations, supra, destroy the presumption *145 of correctness that normally attaches to his determination and shifts the burden to respondent of proving that his determination herein was correct in spite of such errors. Recently, in Commissioner v. Smith, 285 F. 2d 91 (C.A. 5, 1960), where it was likewise urged that the presumption "dropped out" of the case once evidence was produced by the taxpayer, the Court said that "a finding against the Commissioner on one item still leaves on the taxpayer the burden of showing with respect to each other item that the Commissioner was wrong. * * *" In the absence of records or reliable information, respondent was obliged to resort to some reasonably effective technique for the determination of income and petitioner cannot, by lack of cooperation and concealment, deprive respondent of the right to use a practical method of making his determination. Obviously, petitioner's difficulty is of his own making in failing to maintain proper records of his extensive gambling activities, loans, and other material facts. Under the circumstances, we believe that the method adopted by respondent and the results reached were not arbitrary, and that the necessary adjustments which petitioner established *146 at the trial with respect to a few items did not impose on respondent the burden of proving that his determination of deficiencies for the years in question were correct. See Harp v. Commissioner, 263 F. 2d 139 (C.A. 6, 1959), reversing a Memorandum Opinion of this Court. By consecutive timely executed agreements (Forms 872), the period for assessment of the deficiencies and additions to tax against petitioner for each of the calendar years 1941, 1943, [1] 1944, 1945, 1946, and 1947 was held open until June 30, 1952. The deficiency notice in the instant case was issued April 29, 1952. With respect to the years 1937 to 1940, inclusive, since respondent has failed to establish fraud for this period, to be discussed infra, said years are barred by the statute of limitations and we need not consider any disputed items which arise during said years and which have no impact upon other years in question. Before considering the disputed items on our revised net worth schedule (Schedule C), we deem *147 it appropriate to point out that at all times during the years 1937 to 1947 petitioner owned at least one car. The cars were not shown on respondent's net worth schedule because respondent did not have figures as to the cost of the different automobiles. The cost of automobiles, however, increased from 1937 through 1947, and consequently the net worth of petitioner represented by ownership of automobiles would be greater in 1947 than in 1937. In the absence of precise figures and to avoid any inequity to petitioner, no automobiles were included in the net worth schedule for the taxable years involved herein. Likewise, the cash surrender value of petitioner's Penn Mutual Life insurance policy was not shown in respondent's net worth schedule because it was considered that the item "living expenses" included the cost of the premiums paid and any increase in petitioner's net worth based on increase in the cash surrender value of the insurance policy might represent a partial duplication. As indicated on respondent's net worth statement, in determining petitioner's correct taxable income, appropriate allowances and credits for nontaxable income have been given to him. Details of petitioner's *148 nontaxable income are set forth in the joint stipulation of facts which shows that petitioner had nontaxable portions of capital gains arising out of sales of real property and stocks and a small amount of nontaxable income derived from nontaxable interest. The figures shown on respondent's net worth schedule for Federal income taxes paid for the years ended December 31, 1942, through December 31, 1947, represent Federal income taxes paid both by petitioner and his wife. Findings of Fact Cash on Hand December 31, 1936, was selected by respondent as the starting point of the instant case because it was close to the date of July 2, 1937, on which petitioner submitted an affidavit to the Government showing his financial condition in connection with an attempt to settle an alcohol tax liability assessment made in June 1934, and also because it was a date which could be tied in with the previous income tax investigation covering the years 1920 to 1933, inclusive. The opening net worth of petitioner as of December 31, 1936, was reconciled with the closing net worth of the prior income tax investigation for the period 1920 to 1933, inclusive, as a test of the accuracy of the opening net *149 worth. In Banks v. United States, 204 F. 2d 666 (C.A. 8, 1953), at pp. 668, 669, the Court of Appeals recognized the propriety of using the net worth of the defendant (petitioner herein) as of the end of 1936 predicated upon his affidavit filed with the Bureau of Internal Revenue in 1937. The net worth schedule of petitioner prepared by special agents Masica and Hanson for the period 1920 to 1933, inclusive, showed that petitioner's net worth as of December 31, 1933, amounted to $31,228.01. For the years 1934, 1935, and 1936, petitioner reported on his tax returns a net income in the respective amounts of $3,127.62, $4,189.07, and $6,496.25. The following schedule represents a reconciliation of the opening net worth of petitioner as of December 31, 1936, with the closing net worth as of December 31, 1933, which was determined in the prior income tax investigation of petitioner who did not contest the resulting income tax deficiency and additions to tax for fraud under section 293(b) of the 1939 Code. Net worth as of 12-31-33 per prior revenue
$31,228.01
agent report
Plus: Net income reported
1934
$3,127.62
1935
4,189.07
1936
6,496.25
Total net income reported 1934, 1935 and 1936
13,812.94
Total funds available
$45,040.95
Less: Capital stocks and bonds that became worth-
less prior to 1937: AmericanCommonwealth Power
$ 987.60
Corp. Securities of America
1,383.34
Foote Bros. Gear & Machine Co.
936.25
American Eagle Aircraft
540.00
Central Public Services
2,496.41
$ 6,343.60
Cash surrender value of life insurance not
2,493.27
included in net worth
Estimated living expenses for 1934, 1935 and
15,000.00
1936 at $5,000 per year
Total funds applied
$23,836.87
lBalance
of funds
available
as of
12-31-36
$21,204.08
Net worth as of 12-31-36 * *150 20,578.58
Unreconciled difference
$ 625.50 O'Gordon represented petitioner as his lawyer and attorney in fact in connection with the settlement of his income tax case for the years 1920 through 1933. In June 1937, at the termination of the investigation of petitioner for the years 1920 to 1933, inclusive, O'Gordon informed the revenue agent that he would advise Banks not to protest the income tax deficiency and probably not to protest the addition to tax for fraud. O'Gordon also told Special Agent Masica that he thought his client would try to borrow part of the money and arrange to pay the balance out of his salary at the Old Peoria Company, a liquor firm where he was employed. In the affidavit dated July 2, 1937, submitted by petitioner to the Government to compromise the alcohol tax assessment of $33,589.92 made in June 1934, petitioner stated, inter alia: "That it is my opinion that I am actually insolvent at the present time. That the most I have ever been worth was $30,000 about 1920." See Findings of Fact, Background and General Facts *151 for said affidavit in extenso. During the period November 8, 1930, to February 3, 1933, petitioner borrowed small amounts ranging from $400 to $2,500 at 6 percent interest from the First National Bank of Minneapolis. There was a total of 15 such loans (some of which were renewals) during the aforesaid period. Petitioner put up various stocks and bonds with the bank as security for the loans. On one occasion the stock held by the First National Bank of Minneapolis as security for a $400 loan to petitioner declined in value and the bank sold the security, the proceeds being applied to the payment of the note in full. During 1933, petitioner's wife also borrowed $1,000 from the First National Bank of Minneapolis and deposited stocks and bonds as security for the loan. During the period December 5, 1930, to May 6, 1933, petitioner obtained several small loans at said bank on behalf of Flour City Body Corporation. The records of the bank indicate that petitioner "was in need of the money." The loans were secured by bonds and also by petitioner's life insurance. In 1925, petitioner purchased a $10,000 life insurance policy on his life with the Penn Mutual Life Insurance Company. On December *152 27, 1932, petitioner borrowed $1,500 at 6 percent interest with the insurance policy as collateral. The loan was not paid in full until May 28, 1941. On June 23, 1930, a mortgage loan in the amount of $4,000 was taken out with Prudential Insurance Company on the property located at 3952 Beard Avenue South, Minneapolis. On January 2, 1935, when said property was owned by petitioner and he was delinquent in making his loan payments, the Prudential Insurance Company referred the loan to an attorney for foreclosure. No foreclosure proceeding was actually instituted. By 1935 petitioner had paid $500 on the principal of said loan. A mortgage in the amount of $5,000 was taken out on May 8, 1933, against the property known as 3817 Drew Avenue South (Item 51). This property was the residence of petitioner for many years and remained so at the time of trial. Said mortgage was not paid in full until November 1, 1944. In an application for a loan to the Northwestern Savings and Loan Association of Minneapolis dated August 31, 1942, Banks stated that his total assets amounted to "in excess $80,000.00 clear." (This amount coincides with the net worth as determined by the respondent for the year *153 ended December 31, 1942.) Petitioner's two life insurance policies with the Veterans Administration in the total face amount of $10,000 lapsed on July 1, 1934, for nonpayment of premiums due. Section 2337, General Statutes 1923, State of Minnesota, defines the money and credits which an individual was required to report in the money and credits tax returns of the State of Minnesota as follows: As used in this section, the word "money" means gold and silver coin, Treasury notes, bank notes, and other forms of currency in common use; and the credit "credits" means and includes every claim and demand for money or other valuable thing, and every annuity or sum of money receivable at stated periods, due or to become due, and all claims and demands secured by deed or mortgage, due or to become due, and all shares of stock in corporations the property of which is not assessed or taxed in this state. Section 2340 of the same law requires the taxpayer to make a return of the total amount of his "money and credits" taxable under the Act. Section 2341 of the law requires that the return of the taxpayer shall be under oath. Money and credits tax of the State of Minnesota as assessed and paid by *154 petitioner during the years 1929 to 1936, inclusive, are as follows: Valua-
Date
Pen-
Clerk
Year
tion
Paid
Tax
alties
Fee
1929
$2,000
2/24/30
$6.00
1930
3,000
1/24/31
9.00
1931
200
1/13/32
.60
1932
300
3/30/33
.90
1933
450
7/17/34
1.35
.11
.25
1934
450
2/28/35
1.35
1935
450
2/29/36
1.35
1936
250
8/ 2/37
.75
.06
.25 There was no assessment of money and credits tax against petitioner for the years 1913, 1926, 1927, and 1928. There was no assessment for any of the years 1913 and 1926 to 1936, inclusive, against petitioner's wife, Reta. In 1929, an assessment was originally set up against petitioner for money and credits tax showing a valuation of $3,000 and a tax of $9. However, said tax was abated by the State Department of Taxation on January 29, 1930, changing the valuation to $2,000 and the tax to $6. This assessment for money and credits was an assessment against petitioner and not an assessment against his wife. The basis for the reduction in petitioner's money and credits tax was as follows. On January 10, 1930, Reta filed an application on behalf of petitioner for a reduction in the assessed valuation on money and credits with the County Board of Hennepin County, Minnesota. In the application, which was subscribed and sworn *155 to by Reta, she stated that petitioner had no money on hand, on deposit in banks or elsewhere, that an assessment against petitioner showing credits in the amount of $3,000 was an excessive arbitrary assessment, that the true and full value of the credits owing to petitioner was $2,000 and not $3,000 as assessed against petitioner; and she requested a reduction in the assessed valuation of petitioner's money and credits from $3,000 to $2,000. Special Agent McKusick attempted to ascertain how much, if any, cash on hand petitioner had as of July 2, 1937, the date of the aforesaid affidavit submitted to compromise the alcohol tax assessment made in June 1934. McKusick found no evidence of any substantial cash in petitioner's possession as of that date. In question No. 1 of the written questions submitted to petitioner through his attorney, O'Gordon, petitioner was asked how much cash he and/or his wife had on hand as of July 2, 1937. Likewise, in question No. 20, it was asked how much cash was in the possession of petitioner and/or his wife as of December 31, 1947. None of the foregoing questions were answered in the written answers submitted to McKusick. In the period 1930 to 1932, stocks *156 in Foote Bros. Gear and Machine Company, Central Public Service Corporation, Corporation Security Company of Chicago, and Associated Gas and Electric Company were issued to Reta Banks. These and other stocks were put up by Reta as security in 1933 for a $1,000 loan to her. In the course of the investigation of petitioner, McKusick and the other agents working on the case made a diligent but unsuccessful search for cash on hand as of December 31, 1936. Their investigation revealed that Thomas had not inherited any amounts of money or received any substantial gifts during the taxable years involved herein. Opinion Cash on Hand It is fundamental in the use of the net worth method to determine, with reasonable certainty, an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. Holland v. United States, supra. Respondent, in his computation of petitioner's net worth for the taxable years involved, does not include any cash on hand except a bank deposit of $159.15, as of the starting point, December 31, 1936. Petitioner contends, on brief, that he had $70,000 in cash on hand and that his wife had $52,352.46 in cash on hand as *157 of December 31, 1936. In essence, it is petitioner's contention he amassed a cash hoard of $300,000 from his bootlegging activities during the prohibition era and that he had loaned a substantial amount of this cache to his friends during the ensuing years, leaving a balance of $70,000 as of December 31, 1936. Petitioner also argues that he had about $50,000 in currency in his vault, located in his residence, which belonged to his wife and which he had given to her prior to the critical date. We cannot wholly agree with petitioner. Petitioner has advanced a possible source for his accumulation of the alleged cash hoard of $120,000 on hand as of December 31, 1936, ($70,000 of his and $50,000 belonging to Reta), but in view of other facts of record, to be discussed infra, we find his testimony unacceptable and insufficient to support the existence of a cash reserve in the amount claimed. We do not doubt, however, that he did keep substantial funds on hand prior to and during some of the critical years involved herein. The significant question is how much of said personal cash funds were on hand on December 31, 1936. It would extend this opinion interminably, and at the same time serve *158 no useful purpose, to analyze all of the arguments pro and con advanced on behalf of petitioner, on the one hand, and respondent on the other. We have examined each of them with meticulous care. Most of the arguments presented on petitioner's behalf are either unsound, inconclusive, or based on evidence, unworthy of belief. It is impossible, on the record presented, for us to reach a precise conclusion. On the basis of the circumstantial evidence before us, we have determined the amount of petitioner's personal cash reserve on December 31, 1944, to be $60,000, and, in our judgment, there is no credible evidence of an amount in excess of that figure. We do not attribute any additional cash on hand to Reta. While we have reached this conclusion only after a careful analysis of the entire record, the result we have reached is substantially based upon the discussion which follows. Although on the basis of petitioner's affidavit of 1937, there is some justification for respondent's position that petitioner had no substantial cash hoard as of December 31, 1936, we are satisfied that he did have a substantial amount of cash as of that date. As indicated above, the crucial question is how *159 much. While we do not doubt that Thomas engaged in extensive bootlegging activities during the prohibition era, he has failed to establish to our satisfaction that the alleged net profits were kept in cash and intact during the intervening years before December 31, 1936. No reliable records of his alcohol purchases, sales, and cash retentions over the years prior to the critical date were introduced into evidence by him. The evidence shows that up until the year 1931, Thomas' principal occupation was selling alcohol; that as time went on the profits from his sales became less and less; and that for a number of years he sustained a loss from such sales rather than a profit. Moreover, petitioner never knew exactly how much money he was making in connection with his alcohol activities. Assuming that petitioner may have done well from his illicit operations, the facts show that during some of the years prior to the taxable years involved, he was sharing his earnings with others, spending it on extensive travel, and to a substantial degree losing it in stock investments and other ventures. Petitioner admitted that his stock losses in 1931 and 1932 could have been large. There is no evidence *160 of frugality on the part of petitioner and his wife prior to or during the taxable years in question. Contrariwise, the record shows that during the years in question they maintained a comfortable standard of living and took several lengthy vacation trips to Mexico and Hawaii. The record as to the amount of cash on hand which Banks claimed he had as of the starting date presents a jumble of inconsistencies. It is significant, we think, that no mention of any cash hoard was made during his criminal tax trial. The first allegation of cash on hand petitioner set forth in the pleadings was in the instant case (in the reply to second amendment to answer) filed March 16, 1959, three months before trial, wherein it is alleged that cash on hand as of December 31, 1936, was in the amount of approximately $30,000. Later, in the amendment to reply to second amendment to answer filed a month before trial, the amount of said cash was increased to approximately $60,000. At the beginning of the trial, Banks, on cross-examination testified that he had over $200,000 cash on hand as of December 31, 1936, and that the amount of cash on hand set forth in the pleadings was incorrect. Later, in the trial *161 petitioner offered several versions of how much currency he had on hand as of the critical date which ranged from a high of $275,000 to a low of $70,000. On cross-examination petitioner admitted that he did not know how much cash he had on hand as of the opening of the net worth period. It is noteworthy that in his sworn affidavit dated July 2, 1937, submitted to compromise the alcohol tax liability, petitioner did not declare any substantial amount of cash, and stated that he was "actually insolvent" at that time. Petitioner now urges that said affidavit was "false" and did not reflect his true net worth at that time. It is also significant that petitioner never revealed to his accountant, Kinsey, or to his attorney, O'Gordon, anything about cash on hand at the time petitioner's tax case for the years 1920 through 1933 was being settled. Likewise, with respect to the taxable years involved herein, petitioner was unable to recall whether he had ever told his attorney in the instant case how much cash he had on hand as of December 31, 1936. Until a short time before the instant trial Banks did not divulge anything about a cash hoard to his accountants or legal representatives even though *162 there is affirmative evidence that his representatives were interrogated in writing about this vital factor by revenue agents assigned to the investigation. [2] Thus, Special Agent McKusick, in an attempt to ascertain how much, if any, cash on hand Banks had as of July 2, 1937, submitted a list of questions to petitioner *163 through his attorney O'Gordon. In Question No. 1 of the written questions, petitioner was asked how much cash he had on hand as of July 2, 1937, and how much cash his wife, Reta, had on hand as of that date. Also, in Question No. 20, it was asked how much cash was in the possession of petitioner and/or his wife as of December 31, 1947. None of the foregoing questions were answered by petitioner. O'Gordon testified that he attempted to obtain the answers to said questions, that he always followed petitioner's instructions with respect to such matters, and that he (O'Gordon) did not answer those questions which he didn't think he could answer truthfully. O'Gordon testified further that he "never got any results" from interrogating Banks about his cash on hand as of December 31, 1936. Apart from not knowing how much cash on hand he had as of December 31, 1936, petitioner was unable to state how much currency he had in his floor vault at home during the years 1940, 1941, 1945, 1947, or at the time of the trial. Nor did petitioner know how much cash his wife had as of December 31, 1936. We note that after the settlement of the petitioner's income tax case, 1920 through 1933, O'Gordon told *164 Special Agent Masica in June 1937, that his client would try to borrow part of the money required by the settlement and arrange to pay the balance out of his salary at the Old Peoria Company. The deficiency in tax and additions to tax in the prior investigation totaled $5,679.13. Unless O'Gordon was misinformed, it is incongruous that an individual who allegedly had cash on hand in the approximate amount of $120,000, would have to borrow money to pay a tax liability of $5,679.13. During the instant trial, O'Gordon in effect reiterated his prior statements to the Government when he testified that his objective in 1937 was to get the tax down "where we could pay it." In connection with the prior income tax investigation of Banks for the years 1920 through 1933, his accountant, Kinsey, told Masica that petitioner "didn't appear to have much." Kinsey testified that at the time of said investigation he had no knowledge of large amounts of cash on hand or of substantial amounts of debts owing to petitioner. Kinsey testified further that Banks never told him that he had large amounts of cash on hand at or about 1935 to 1937. The record shows, as set forth in our Findings, that prior to the *165 taxable years in question, Banks on several occasions conducted his financial affairs unlike an individual claiming a substantial cash reserve. During the period November 1930 to February 1933, petitioner borrowed small amounts of money ranging from $400 to $2,500 at 6 percent from the First National Bank of Minneapolis. We do not accept petitioner's explanation that these small borrowings actually represented loans which were made under his name to his friends. Likewise, during 1933 Reta borrowed $1,000 at 6 percent from said bank and deposited stocks and bonds as security for the loan. No explanation was advanced by petitioner or Reta why it was necessary for her to borrow $1,000 when she purportedly had about $60,000 in cash in a wardrobe trunk at home. Other factors cast further doubt upon the tenability of petitioner's contention. For example, during 1930 to 1933, inclusive, Banks obtained several small loans at the aforesaid bank on behalf of Flour City Body Corporation. In 1932, he borrowed $1,500 at 6 percent on a $10,000 life insurance policy with the Penn Mutual Life Insurance Company. Said loan was not fully paid until May 28, 1941. Our view is the same with respect to the *166 mortgage loan in the original amount of $4,000 which was taken out with the Prudential Insurance Company on the property located at 3952 Beard Avenue South, Minneapolis, Minnesota. The loan originated on June 3, 1930, and by 1935 only $500 had been paid on the principal. On January 2, 1935, when the property was owned by petitioner the mortgagee referred the loan to an attorney for foreclosure. Also, it is noted that a mortgage in the principal amount of $5,000 was taken out on May 8, 1933, on petitioner's residence located at 3817 Drew Avenue South, Minneapolis, and was not paid in full until November 1, 1944. Although petitioner may have a valid reason for the extended time of payment, it tends to negate his contention that he had a substantial cash hoard during those years. The fact that the mortgage was paid up in 1944, we think, buttresses respondent's determination that Banks was earning large amounts of unreported income at that time and during the taxable years involved herein. Moreover, the fact that petitioner permitted two life insurance policies with the Veterans Administration in the total face amount of $10,000 to lapse on July 1, 1934, for nonpayment of premiums due, *167 further militates strongly against his cash hoard story. Although petitioner may have had a plausible reason (though undisclosed) for allowing his policies to lapse, it tends to negate his contention that he had a substantial cash hoard during those years. Likewise, it is difficult to understand why Reta, who claims that her husband had assets in excess of $30,000 in 1929, would file a sworn application in that year with the State of Minnesota Department of Taxation on behalf of petitioner stating that the full amount of her husband's assets subject to the money and credits tax, was only $2,000 instead of a valuation in the amount of $3,000, in order to save $3 in tax. Without further elaboration we find the foregoing transactions inconsistent with the possession of sizeable amounts of cash. To the same effect, see Blackwell v. United States, 244 F. 2d 423 (C.A. 8, 1957), and Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court. While we do not doubt that petitioner may have kept some cash in his home prior to and during the taxable years involved, it is difficult to believe that petitioner, who impresses us as a shrewd businessman, would *168 leave about $300,000 in cash in a wardrobe trunk in his house while he and his wife took pleasure trips to California for extended periods. There are numerous circumstances supported by the record which demonstrate beyond question that petitioner is unworthy of belief. His numerous convictions and his admittedly false statements and false affidavits alone establish that an oath meant nothing to him. We need not repeat the further circumstances which support the same view. We are likewise satisfied that Reta's testimony is not to be accepted as credible. She was obviously biased and willing to testify to anything which she thought might be helpful to petitioner. We are urged to accept the testimony offered by petitioner as uncontradicted, but it is clear that the circumstantial evidence in the case furnished clear contradiction of such evidence. Moreover, the witnesses relied upon by petitioner were, in our opinion, unworthy of belief. Obviously, we are not required to accept blindly testimony which patently appears to be "highly improbable and manifestly unreasonable." Carmack v. Commissioner, supra, p. 621; Rand v. Helvering, 77 F. 2d 450, 451 (C.A. 8, 1935). Viewing the record *169 as a whole we believe the amount of cash on hand claimed by Banks is considerably inflated. His testimony at the trial was given after the significant issues in the case had been largely crystallized, and after respondent's statutory notice had been issued. It was then quite apparent that an opening personal cash hoard of $120,000, plus loans receivable of $248,250, to be discussed infra, (of which about $50,000 was attributed to Reta) would dovetail very effectively with petitioner's approach in his effort to demonstrate complete error in respondent's determination. Under the circumstances, we think petitioner's statements with respect to his cash on hand during the period involved made at the tiral was a mere rationalization based on his then projected position rather than on reliable recollection. Despite the foregoing, we conclude, in the light of the needs of the types of business in which petitioner engaged, that he did have substantial cash on hand prior to and during the taxable years involved and that it is reasonable to infer from all of the circumstances that the amount was $60,000 as claimed in his amended reply to second amendment to answer. We are satisfied that it was *170 not in excess of that amount. We accordingly find opening cash in that amount as of December 31, 1936. At the same time, however, we think it reasonable to infer, from the nature of petitioner's business activities during the period in question, that this sum was in the nature of a revolving "bank roll" which varied little during the period 1936 to 1947, and we therefore attribute the same amount as of December 31st of each of the years 1937 to 1947, inclusive. In any event, petitioner has offered no acceptable evidence that he had less cash at the end of each year as the period progressed. In fact, in so holding, we think we give him the benefit of any doubt because we are satisfied that any variation would be reflected in an increase rather than a decrease in each of the years following 1937. Our conclusion attributes no additional cash to Reta because the circumstances in the record amount to a refutation of such a possibility. Accordingly, in our adjusted net worth statement (Schedule C), cash on hand in the amount of $60,000 is shown as a constant amount during the entire taxable period involved herein, and any increases or decreases in net worth determined by us will not be affected *171 by the cash item. We attribute no significance to the calculation of cash on hand for the years in question made by petitioner's accountant, Zimmerman, since Zimmerman had no way of verifying the figures used in his reconstruction of petitioner's net worth. Findings of Fact Accounts Receivable - General At no time during the investigation of Banks for the years 1920 to 1933, inclusive, did the agents involved in the examination find any suggestions regarding accounts receivable that are now claimed by petitioner. Similarly, in the course of his investigation of the taxable years involved herein, Special Agent McKusick and the other agents working on the case made a diligent search, without success, for accounts receivable or any outstanding obligations owing to petitioner in any substantial amounts as of December 31, 1936. Petitioner's accountant, Zimmerman, who prepared his net worth statement in the instant case, never furnished any information relating to receivables to any agent or representative of the Internal Revenue Service who was working on the Banks case prior to May 1959. Likewise, Michael Malone, Special Agent of the Intelligence Division, Internal Revenue Service, discussed *172 petitioner's entire case with him while Banks was in prison for criminal tax evasion, and petitioner did not mention anything relating to receivables at that time. Also, in discussions between Malone and O'Gordon, the latter never told Malone anything about receivables owing to petitioner. Malone discovered in June 1958 that petitioner was claiming in the instant case that he received repayments on loans to Michael O'Connor. This information was discovered through confidential sources who were friends of petitioner and was obtained without any assistance of petitioner or his counsel. Petitioner's counsel at no time informed Malone that petitioner was claiming that O'Connor had been repaying money to him during the taxable years involved herein. In June 1958, Robert O'Connor (Michael's brother), was interrogated by representatives of the Internal Revenue Service regarding the O'Connor loan. In conferences held in 1958, petitioner's counsel, Maun and Coffey, were asked for any information relating to assets of petitioner, including any receivables. Maun replied that he would furnish such information in court. In a hearing before the Tax Court in Washington, D.C., on respondent's motion *173 (filed on July 29, 1958), petitioner's counsel, Maun, orally stated on September 17, 1958, that petitioner was claiming about $300,000 loans receivable and about $60,000 in cash as of the beginning of the instant net worth period. On March 16, 1959, petitioner filed a reply to second amendment to answer, in which, for the first time, he asserted in the pleadings that there were receivables due petitioner as of December 31, 1936, in the amount of $262,850. Petitioner did not set forth any details as to the individuals from whom these receivables were claimed to be due or any breakdown of the various individual receivables claimed. Also, petitioner affirmatively alleged that he had cash on hand in addition to bank accounts in the amount of approximately $30,000. On April 3, 1959, respondent filed with the Tax Court a motion to make said reply more definite and certain and to require verification of the reply. Respondent sought thereby to require petitioner to divulge details relating to the receivables which he was claiming were owing as of December 31, 1936. On April 30, 1959, the Tax Court entered an order requiring petitioner to identify in some reasonable way the receivables he was *174 claiming by including a statement, inter alia, of the nature of each, the debtor or payor from whom the amount is due, the date when the obligation arose, and the date of payment; and also requiring petitioner to state the location of the cash he was claiming. On May 19, 1959, (less than a month before the instant trial) petitioner filed an amendment to reply to second amendment to answer in which he set forth the names of the debtors, James A. Carlson, Herman Mitch, Michael Code, Michael O'Connor, Theodore Brown, and Stanley Schultz. Petitioner did not set forth any addresses or other identification of the alleged debtors. At the commencement of the Tax Court session in St. Paul, on June 15, 1959, the Tax Court granted respondent's motion to require petitioner to supply the addresses or other reasonable identification of the aforesaid debtors. In response to the Court's order, petitioner, through his counsel, furnished in writing three addresses, two of which were wrong. Petitioner prepared a slip of paper entitled "December notations" which he allegedly gave to Michael O'Connor at the time of an argument over the amount allegedly owed to petitioner. Said slip states "Michael O'Connor *175 notes for $135,650.00." Petitioner also prepared a slip of paper entitled "August notations" representing the loans allegedly owed to petitioner by Michael Code. Likewise, petitioner prepared a slip entitled "October notations" representing a record of the alleged loans from petitioner to Herman Mitch. The handwriting on all three of the aforesaid slips of paper was that of petitioner. Michael O'Connor never gave a note to petitioner. (a) Michael O'Connor Receivable ($150,000) Michael O'Connor's principal occupation was gambling. In 1924 he had an establishment with several pool tables, card tables, and a small bar. During that year he was also engaged in bootlegging activities. The known sources of O'Connor's income consisted of the Mill Pond Trout Club (hereinafter sometimes called Mill Pond), from 1936 to 1940, and thereafter the Paddock Cigar Store and the 318 Club. O'Connor had a 35 percent interest in the 318 Club, a gambling establishment, which was in operation during 1941 to 1944. All individuals who had an interest in said club put up some money (i.e. a "bank roll") so that losses on wagers could be paid. O'Connor put up money for this purpose. Banks was associated in the *176 318 Club with O'Connor. Every month during the period O'Connor operated the 318 Club, he would pay an undisclosed amount of money to petitioner representing petitioner's share of the profits of the 318 Club. The Mill Pond Trout Club located at Shakopee, Minnesota, was opened in 1934. O'Connor worked at the gambling establishment as a croupier for about two years. In June 1936, O'Connor purchased an undivided one-third interest in the Mill Pond. Since O'Connor did not have sufficient funds at that time to purchase said interest, he furnished some equipment and executed a note for the balance. The note was subsequently paid off from the earnings of the business. At the time O'Connor executed said note he did not mention anything to the other partner, Otto Siems, about being in debt. Siems and O'Connor were in a partnership with respect to the Mill Pond in which they were equally liable on debts and obligations of the business. After 1936, Siems, Ed McMahon, and O'Connor each had a one-third interest in Mill Pond. Siems had a close business relationship with O'Connor. Siems did not have any knowledge of the profits from the Mill Pond being distributed to petitioner. The average annual *177 one-third split of the profits from the Mill Pond amounted to $10,000 or $12,000 to each co-owner. At the time the casino part of the Mill Pond was dissolved in October 1941, there was a three-way split of the profits, which amounted to not over $2,000 for each partner. For a short time after the casino in connection with the Mill Pond closed in 1942, the Mill Pond continued to have pinball machines, slot machines, and liquor. After 1942, the Mill Pond was a liability. In question No. 5 of the written questions submitted to petitioner through his attorney, O'Gordon, it was asked whether petitioner had any interest in the Mill Pond. He was asked to give the dates and amounts of advances or investments and dates and amounts of any repayments. The answer given was that petitioner had no interest therein. In 1936 or 1937, Halvor Steenerson, an accountant, began preparing Federal income tax returns for the Mill Pond at the request of Siems. Steenerson continued to prepare said returns until the dissolution of the casino, which was part of the Mill Pond. When he first began preparing the tax returns, the Mill Pond was a corporation. Later, about 1937, it was changed to a partnership. When *178 Steenerson commenced to prepare the Federal income tax returns of the Mill Pond he required that someone other than the partners make up the daily cash sheets. Raymond Hill was employed for this purpose. His job consisted, among other things, of counting the cash at night, recording it on a sheet, and also reporting any cash shortage. His daily report was mailed to Steenerson in St. Paul. Steenerson made an effort to see that the information was complete and regularly submitted, although he never personally counted the cash. In order to keep account of the winnings at roulette at Mill Pond, all of the money was dropped in a slot that was in the table. Winnings at the dice games were handled in the same way. Raymond Hill counted the money that was taken out of the slot machines. The owners of the Paddock Cigar Store were Owen Taylor and Michael O'Connor. Baseball betting and some card playing were carried on at the Paddock Cigar Store. Steenerson also kept the books of Paddock. Steenerson prepared both the Federal and state income tax returns of Michael O'Connor for the years 1937 to 1946, inclusive. In connection with the preparation of O'Connor's return, Steenerson required some sort *179 of an accounting for his income as well as his disbursements. O'Connor agreed to give Steenerson such a statement each year. For the years 1938 and 1939, O'Connor claimed on his Federal income tax returns as dependents 10 nieces and nephews. In 1940 he was allowed to take only three dependents by the Internal Revenue Service. He was financially unable to make his tax payments when they were due. The maximum net income reported by O'Connor for the years 1937 through 1946, inclusive, is as follows: Year
Amount
1937
$14,243.00
1938
11,961.77
1939
13,815.38
1940
16,833.32
1941
(3,037.37)
1942
8,341.73
1943
7,042.73
1944
8,114.00
1945
6,841.08
1946
2,907.45
$87,063.09
During the years 1937 to 1946, O'Connor and his wife lived well. O'Connor did not have a safety-deposit box. He did have a safe at his home where he kept money. The most that he ever kept in this place was about $500. Robert O'Connor, also known as Bob O'Connor, was a brother of Michael O'Connor. Robert's tendency to excessive drinking caused Michael considerable anxiety. Robert never did any work prior to 1937. In 1937 he did some work at the Mill Pond. Michael would not allow his brother, Robert, to operate the 21 game or do anything else around *180 the Mill Pond when he knew his brother was drinking. About 1942, Robert was employed at the 318 Club dealing blackjack. About 1946, Robert worked as a doorman at the Paddock Cigar Store. Robert's duties as a doorman consisted of seeing that no strangers came in to the gambling establishment where a book was maintained for baseball and football games and the like. Michael O'Connor had a proprietary interest in the Paddock Cigar Store. During the entire time from 1938 to 1947, Robert visited the home of Michael O'Connor only on seven or eight occasions. At the time of the trial neither Robert nor his wife was employed. The only income he had $400was a year rent from a piece of ground. Freda and Michael O'Connor were husband and wife from 1939 until Michael's death in 1947. When Freda first met Michael in 1933, he was a card dealer. Freda was the beneficiary of a trust fund which had provided her with an independent means of income since 1931. She assisted her husband financially during the years 1937 to 1947. Freda was the administratrix of her husband's estate. Michael never told his wife, Freda, anything about any debt or large amount of money that he owed to petitioner. Michael borrowed *181 the sum of $3,000 from petitioner on February 21, 1947, and gave petitioner a formal note. After Michael died, petitioner filed a claim against the estate of Michael O'Connor based on the amount owing on the aforesaid formal note. The $3,000 loan appears as Item 12 on respondent's net worth schedule. The claim filed against the estate of Michael O'Connor was subsequently allowed in the amount of $2,000. Only the amount of $4,623.37 was available in Michael's estate for the payment of the expenses of administration and claims filed against the estate. (b) Michael Code Receivable ($46,000) The maximum net income reported by Michael Code for the years 1937 through 1946, inclusive, is as follows: Year
Amount
1937
$ 3,870.56
1938
2,777.78
1939
2,500.00
1940
2,222.22
1941
1,936.87
1942
1,503.42
1943
2,341.06
1944
6,567.64
1945
7,857.70
1946
8,151.53
Total
$39,728.78 Code passed away on December 1, 1946. His estate showed total receipts from all sources in the amount of $41,467.66. The total residue available for distribution amounted to $17,824.16. In his amendment to reply to second amendment to answer, petitioner alleged that Code owed him $1,000 at the time of his death. Petitioner did not file any claim of *182 any kind against the estate of Michael Code. (c) Herman Mitch Receivable ($31,000) The maximum net income reported by Herman Mitch for the years 1937 through 1947, inclusive, is as follows: Year
Amount
1937
$ 3,222.22
1938
3,222.22
1939
3,222.22
1940
2,968.61
1941
1,666.67
1942
1,200.00
1943
1,697.94
1944
2,188.35
1945
9,210.70
1946
3,074.18
1947
1,684.20
Total
$33,357.31
Herman Mitch passed away on June 16, 1948. The estate of Herman Mitch reported total receipts in the amount of $20,410, and had a residue for distribution in the amount of $7,348.55. Petitioner did not file any claim of any nature against the estate of Herman Mitch. A claim was filed in 1948 against the estate of Herman Mitch for unpaid personal property tax for the year 1941. The original tax was $37.83, together with $21.23 interest and penalty, and $8.75 costs. Robert Mitch was Herman's son. Robert lived at home with his father during the years 1937 to 1941. When Robert attended college in 1941 and prior thereto, his tuition was usually paid by his father. Herman did not pay his son's tuition for the last half of 1941 and the tuition remained unpaid from 1941 until 1945. When Robert was released from the Army he paid it himself. (d) James *183 A. Carlson Receivable ($15,000) James A. Carlson became blind in 1937. Petitioner bought a seeing eye dog for Carlson. The liquor establishment known as James A. Carlson, Inc., reported net income in the year 1940 in the amount of $4,236.51. In the year 1941, James Carlson, Inc., reported a net loss in the amount of $5,295.10. Carlson ceased operating his liquor store in January 1942, when James Carlson, Inc., went into bankruptcy. In the year 1935, Carlson filed a Federal income tax return showing a tax liability of $27.23. In the year 1936, Carlson filed a Federal income tax return showing a tax liability of $33.67. In the years 1937 through 1941, Carlson filed Federal income tax returns which showed that no Federal income tax was due. In the year 1942, Carlson did not file a return. In the year 1943, Carlson filed a return which showed that no Federal income tax was due. (e) Theodore Brown Receivable ($11,750) During 1925 and 1926, Brown purchased alcohol and liquor from petitioner which he resold. About 1928 Brown ceased selling alcohol because he was "called before a Federal court," where he pleaded guilty to a "charge" and received a suspended sentence. During the 1920's, *184 Brown received income from a hotel, hunting lodge, and from the sale of alcohol. Prior to 1928 or 1929, he did not file any income tax returns. Brown purchased the Palace Hotel at Miles City, Montana, for $9,000 in 1926. He sold the hotel for $11,000 in 1929 and did not report the sale on his Federal income tax return. Brown did not pay more than $56 in Federal income tax in any one year between 1937 and 1947, except in the year 1941 when he was working for the Federal Government and a larger amount of tax was withheld. (f) Stanley Schultz Receivable ($11,600) Schultz's occupation in 1929 and 1930 was dealing in illicit alcohol. During the 1920's Schultz purchased alcohol and whiskey from petitioner. In 1937, Schultz was convicted of a crime which included hijacking a truckload of whiskey. In 1924 or 1925, Schultz was convicted of the crime of transporting liquor in La Moure County, North Dakota. Schultz was released from the penitentiary around 1940. Schultz had $50 to invest in the Alaska Club Tavern in Seattle, Washington. The balance of the purchase price of $6,500 was paid by Jack Hect. Schultz repaid Hect a loan of $6,500 during the years from 1942 to 1944. In 1945 Schultz's *185 wife had a stroke and was paralyzed for three years. Her illness was expensive and required the attention of three practical nurses. Schultz's wife died in 1948. From 1945 to 1948, Schultz did not have any employment except for some gambling. He spent most of his time taking care of his wife. Schultz did not earn any appreciable amount of money in that period of time. Opinion Accounts Receivable - General We turn to consider petitioner's claim that respondent's beginning net worth statement omits loans receivable in the aggregate amount of $248,250 which he claimed he had loaned to friends. Preliminarily we note petitioner testified that although the money he had allegedly saved in his wardrobe trunk represented "everything" to him, the only use he had made of the money in question prior to 1936 had been to lend the money out to his friends without interest or security. Petitioner further testified that he would require formal notes in the case of small loans, (around $2,500) but not in the case of a large loan. That Banks would loan a total of about $265,000 which allegedly represented his life's savings (acquired in illicit and hazardous activities) without notes, security, or interest, *186 in most instances to individuals with the most questionable financial and moral background, is unbelievable and completely out of context with the profit seeking motivation of petitioner. The loans which Banks contends that he had at the beginning of the net worth period may be divided into two categories; receivables alleged to be due from Michael O'Connor, Michael Code, and Herman Mitch, which constitute large receivables and the smaller loans allegedly made to James A. Carlson, Theodore Brown, and Stanley Schultz. In the case of the large receivables the alleged debtors were all deceased at the time of the instant trial. None of the alleged debtors apparently told members of their family, business partners, accountants, or any other associates, about the alleged loans from Banks. We have carefully considered the testimony relating to the three slips of paper which petitioner introduced into evidence to establish repayments of the three large loans. The slips of paper were all in the handwriting of Banks and not of the alleged debtors. (As to the alleged large obligations, petitioner received no evidences of indebtedness signed by the debtors.) It is our view that the testimony *187 of Richard Bowen, the questioned documents expert called by petitioner, does not contribute in any significant way to the establishment of petitioner's contention. To the contrary, we think his testimony casts considerable doubt on the significance of the three slips of paper. Bowen testified that the slip designated "August notations" was written at two sittings; that entries from 1938 through 1944 were made at one writing; and that entries for the year 1945 were made at a second writing. Likewise, Bowen testified that the entries on the slip for November 1942 and July 1943 were written continuously at one time. Although Bowen had no opinion regarding either the age of the ink or of the paper which constitutes the three slips of paper, he stated that it was possible all of the writing on the three slips of paper could have been done at the same time if an individual changed the ink, writing style, and spacing. He could not tell whether or not the three slips "December notations," "October notations," and "August notations," were made at the same time. In any event, with or without Bowen's testimony and irrespective of the time or times at which the notations were made, such notations *188 are merely self-serving statements which could have been made by petitioner if they were false as well as if they were true. The record abounds with false statements made by petitioner as well as fraudulent acts and omissions. We find nothing to satisfy us that the particular notations were true, and the surrounding circumstances, including the failure of petitioner to get signed evidences of indebtedness, and his general conduct and want of credibility point to the conclusion that they are false. (a) Michael O'Connor Receivable ($150,000) The largest loan in controversy is the alleged loan to Michael O'Connor in the total amount of $150,000. Petitioner contends that his first loans to O'Connor were made in the early 1920's shortly after O'Connor left petitioner's employment in his bootlegging operation and had gone into business for himself; that during the years 1921 to 1936, additional loans were made and repayments were received; and a running account was kept by both petitioner and O'Connor. Petitioner maintains further that during the early part of 1936 O'Connor borrowed $100,000 in cash from him to renovate a gambling establishment which O'Connor opened that year in Minneapolis *189 and operated for two or three months; that toward the end of 1936 after said establishment went out of business, O'Connor borrowed an additional $25,000 in currency from Banks to buy an interest in the Mill Pond; and that as a result of said loans, O'Connor was indebted to petitioner in the aggregate amount of $135,650 as of December 31, 1936. When asked if he didn't think O'Connor was a poor risk, Banks replied "Not from the kind of fellow he was - he had a bad habit of gambling - he was a wonderful fellow." In our opinion, O'Connor does not appear to be the type of individual to whom a shrewd businessman such as Banks would loan $150,000 without any evidence of such indebtedness signed by debtor, particularly when he took a note from the same alleged debtor for a loan of $3,000. The record shows that Michael O'Connor discussed his financial condition with his accountant Steenerson but that O'Connor never mentioned anything about his indebtedness to petitioner at any time. The record also shows that Michael O'Connor only had a maximum net income of $87,063.09 from known sources during the years 1937 to 1946, inclusive, and, hence, he did not have sufficient income to reimburse Banks *190 $150,000 during the period January 1938 through July 1945. The determination of O'Connor's maximum net income is based on retained copies of his own Federal and state income tax returns, the testimony of Steenerson who prepared O'Connor's returns, and the tax returns of the Mill Pond and the Paddock Cigar Store. We are satisfied that all of O'Connor's income from the Mill Pond was correctly reported to Steenerson on a daily record. The maximum net income of O'Connor is also supported by the testimony of Siems, his partner in the Mill Pond. We think it reasonable to infer that Michael had only the income which he reported during the period involved, and petitioner has not directed our attention to any other source of income of O'Connor, legal or otherwise, which would have enabled him to repay petitioner the $150,000 in question. It is noteworthy in this connection that O'Connor and his wife lived well during the taxable period involved so that a large part of his maximum net income went toward living expenses and was not available for any alleged repayments to Banks. That O'Connor did not have a substantial income is supported by the fact that he had difficulty in making his tax payments *191 on time, and that some of his tax payments were delinquent. We think it clear that a consideration of all of the relevant circumstances support a reasonable inference that O'Connor did not have sufficient earnings to reimburse Banks the sum of $150,000 during the period January 1938 through July 1945. Petitioner's contention that he loaned O'Connor $25,000 at the time O'Connor wished to buy an interest in the Mill Pond is inconsistent with the evidence of Siems, who testified that O'Connor did not have any money to purchase a one-third interest in the Mill Pond in June 1936, and that O'Connor obtained his interest by furnishing some equipment and giving his note for the balance of the purchase price. Said note was subsequently paid off from the earnings of the business. We have painstakingly considered the testimony of Robert O'Connor (Michael's brother) with respect to the alleged loan of $150,000, and find it both vague and unworthy of belief. Upon consideration of all of the evidence relevant to the alleged loans to O'Connor totaling $150,000, we conclude that no such loans were made, and that no such amount was paid by O'Connor to petitioner during any period or periods here relevant. *192 (b) Michael Code Receivable ($46,000) The alleged indebtedness of Michael Code in the amount of $46,000 constitutes the second largest receivable in dispute. It is petitioner's position that Code was indebted to him as of December 31, 1936, in the amount of $46,000; that this indebtedness arose out of cash and property which Banks had made available to Code during the 1920's, and that petitioner prepared duplicate memoranda slips in 1937 covering the exact amount of the Code debt at that time. In support of his contention petitioner has introduced a memorandum slip showing the original amount of said indebtedness and the purported repayments thereof during the period 1937 to 1945, during which period it is claimed that the alleged debt was paid off in full. Petitioner avers that in 1928 or 1929 he left his inventory of alcohol with Code and agreed to give Code 50 percent of the profits from the sale of the merchandise; that when petitioner returned from a trip he discovered that Code had dissipated said alcohol inventory. Petitioner states further that the cost basis in the inventory dissipated was $41,000, and that said amount, plus the $5,000 in cash that petitioner loaned Code *193 prior to 1937, was repaid by Code to petitioner the period August 4, 1941, to July 1945, except for a balance of $1,000 which was forgiven by petitioner when the final payment was made. We have carefully considered petitioner's testimony relating to the alleged indebtedness and the slip of paper entitled "August notations." For the same reasons discussed in relation to the O'Connor item, we attribute no significance to the self-serving statements made on the slips of paper. We do not think that the testimony of Murnane (a Deputy United States Marshal called by petitioner) may be taken as a corroboration of petitioner's position. While Murnane may have observed money being counted by petitioner, Code, and Ewing, in 1945 at the Casanova Bar, Murnane was unable to state how much cash was being counted or whose money was being counted. Nor did he know the purpose for which it was being counted. The money being counted could have belonged to Ewing (now deceased) or could have related to payments made in an entirely different context. Petitioner maintains that in 1928 or 1929 Code dissipated his inventory of alcohol and whiskey through gambling and drinking and squandered his money as well. *194 Petitioner, however, produced no record of the cost of the alcohol involved, or any written evidence signed by Code acknowledging any indebtedness to petitioner. The financial condition of Code, as disclosed by our findings, is sufficient to demonstrate the practical impossibility that Code paid all but a small amount of the alleged indebtedness during the years in issue. Code only reported $39,728.78 as income during the period 1937 through 1946, out of which Banks would have us believe Code paid him $45,000 and still had enough on hand to have an estate of $41,467.66 at the time of his demise in December 1946. Petitioner urges that the sum of $1,000 remained unpaid on the alleged indebtedness of $46,000. In this connection, we observe that petitioner did not file any claim against the estate of Michael Code for $1,000 although there were sufficient assets in the estate to pay such claim. But in the case of his "dear friend" O'Connor, petitioner filed a claim based on a formal note in the amount of $3,000, even though there were insufficient assets in the estate to pay the claim in full. The evidence again satisfies us that the indebtedness was a fabrication, and that, in any event, *195 Code did not pay petitioner $45,000 or any other substantial amount during the period December 31, 1936, to December 31, 1947, inclusive. (c) Herman Mitch Receivable ($31,000) The third largest sum involved is the alleged loan to Herman Mitch in the amount of $31,000. Petitioner contends that during the 1920's he advanced cash and property to Mitch on the guaranty of Fred Ullrich, a close acquaintance of petitioner. Petitioner avers that, in order to eliminate any question as to the amount of the indebtedness and the repayments thereon, in 1937 he prepared duplicate memoranda slips with respect to Mitch's indebtedness which amounted to $31,000 at that time. Petitioner maintains further that as the payments were received from Mitch, which he claims amounted to about $13,000 during the period 1941 through 1944, entries showing the dates and amounts thereof were made on the duplicate slips by petitioner. The memorandum written by petitioner on the slip presented in evidence is no more convincing as to Mitch than the like slips relating to O'Connor and Code. Mitch died in 1946, about a year after Ullrich had died. It is petitioner's contention that as a result of the death of Mitch and *196 Ullrich, the balance of said loan receivable in the amount of $18,000 became uncollectible in 1946, and that petitioner was entitled to a bad debt loss deduction in that year under section 23(k)(1) of the 1939 Code, and Regs. 118, section 39.23(k)-1(d). At the outset we note that when the criminal tax case of Banks was in progress, Weinstock told McKusick that Mitch had repaid $19,000 which he owed to Banks into a Weinstock Trustee Account. No disclosure of this alleged payment was made by anyone during the period of the investigation of petitioner relating to the criminal charge and no supporting records were produced. This claim does not correspond with the alleged repayments by Mitch in the amount of $13,000 claimed in petitioner's pleadings and in his testimony in the instant case. Mitch was one of the operators of the gambling establishment known as Casablanca, Inc. When petitioner was asked what caused him to first become interested in Casablanca, he stated that Mitch owed him money at the time and he was trying to place Mitch in a situation where petitioner would have a chance of reimbursement. Petitioner also testified that Mitch operated a gambling establishment known as the *197 Hollywood Inn. The deed to the Hollywood Inn was in the name of Banks and his wife. The record supports the view that Mitch did not have sufficient income either to invest in businesses or to make repayments in the amount of $13,000 to Banks during the period 1941 through 1944. During said period, when Mitch allegedly repaid $13,000 to petitioner, Mitch reported a total maximum income of only $6,752.96. It is noteworthy that Mitch was unable to pay the last half-year tuition of his son at college. Also, the personal property tax against Mitch for 1941 was delinquent and was not paid until a claim therefor was filed against the estate of Herman Mitch in 1948. Our attention has not been directed to any evidence that Mitch had any accumulated funds or undisclosed income whether or not derived from unlawful activities during the years 1941 through 1944 from which he could have reimbursed petitioner the sum of $13,000 during said period. We observe that when Mitch died his estate had a residue for distribution in the amount of $7,348.55. Petitioner did not file a claim against the estate of Mitch as he did in the case of his "dear friend" Michael O'Connor. Without repeating our discussion *198 in detail, we conclude for substantially the same basic reasons as those discussed in relation to O'Connor, that the alleged loan to Mitch never existed and that Mitch did not pay petitioner $13,000 or $19,000 during the years in question. Since we hold there was no such loan, it follows that there can be no bad debt deduction allowable to petitioner. (d) James A. Carlson Receivable ($15,000) In the case of the smaller loans, including the alleged loan to James A. Carlson in the amount of $15,000, the pattern is reversed from the ones existing with respect to the larger receivables. In the case of the alleged smaller loans petitioner does not claim that he ever gave any of the debtors any memorandum slips of paper representing repayments. Preliminarily, it is to be noted that with respect to two of the small debtors that petitioner gave wrong or misleading addresses when required by Order of Court of June 15, 1959, to supply respondent with the addresses of the alleged debtors. It is petitioner's position that as of December 31, 1936, Carlson owed him $15,000 which petitioner had loaned to him in 1934 to enable him to open an off sale liquor establishment in Minneapolis; and that *199 in 1942, prior to the bankruptcy of James A. Carlson, Inc., petitioner received $15,000 in cash from Carlson. Carlson did not earn sufficient money to pay Banks $15,000 in 1942. About 1937 Carlson became blind. In 1940, the liquor store which he operated only showed net income of $4,236.51 and in 1941 said establishment reported a net loss in the amount of $5,295.10. Carlson did not report sufficient income to require the payment of Federal income tax for most of the years prior to 1942. It is not suggested that petitioner received any written or signed evidence of the debt or that any record of it was made on the books of Carlson. Carlson was not called as a witness in the criminal trial. We conclude, upon consideration of the surrounding circumstances, and without reliance upon any presumption, that no such loan was ever made, and, as a corollary, that the alleged repayment never occurred. (e) Theodore Brown Receivable ($11,750) Petitioner contends Theodore Brown owed him the sum of $11,750, resulting from cash and merchandise advanced to Brown during the 1920's, and that part of said indebtedness was repaid to petitioner prior to the opening of the net worth period. It is petitioner's *200 position Brown owed him $9,000 as of December 31, 1936, and that said debt was paid to petitioner in cash in 1946 shortly after Brown sold his hotel in Mobridge, South Dakota. There is considerable confusion between the pleadings and the testimony as to how much of the alleged indebtedness was repaid prior to December 31, 1936. We found the testimony of Brown, a former bootlegger, shrouded in confusion and unworthy of belief. Brown's testimony was inconsistent and confused as to the dates and amounts of the alleged loans and repayments to petitioner. Brown testified he repaid Banks $4,975 when he sold the Palace Hotel at Miles City, Montana, in 1929. However, if Brown owed petitioner $11,750, and repaid him $4,975 in 1929, as he claims, the amount remaining to be paid on the alleged loan in 1946 would be $6,775 rather than $9,250 as alleged by petitioner in his pleadings, or about $9,000 as stated by Brown at the trial. Moreover, the alleged repayment of $4,975 in 1929 is inconsistent with the pleadings wherein it is alleged that Brown repaid petitioner $2,500 in 1935. Petitioner testified Brown paid him about $3,500 in 1935. At the trial, however, Brown denied that he made a payment *201 to petitioner in 1935. Likewise, it is alleged in the pleadings that the loan to Brown was made in 1931. Brown, however, testified that the alleged loans occurred between 1922 and 1929. Again there is no suggestion that Brown gave petitioner any signed evidence of the alleged indebtedness. Brown stopped selling alcohol in 1928 because he was called before a United States Federal court and pleaded guilty to a charge. Upon considering all of the relevant evidence, we conclude the alleged loan to Brown and its repayment is a fabrication which is merely part of the pattern applicable to the several alleged indebtednesses already considered. (f) Stanley Schultz Receivable ($11,600) Petitioner contends that during the prohibition era he loaned $11,000 in cash to Stanley Schultz and also gave him an automobile which cost $600; that $8,000 of said indebtedness was repaid to him in December 1945 upon the sale of Schultz's interest in the Alaskan Club Tavern, Seattle, Washington, and that the balance was paid at the time Music Installation, Inc., was liquidated in 1948 or 1949. Again we face the same pattern. An alleged borrower claims petitioner loaned him $11,000 in cash and gave him an auto *202 which cost $600. No note or other evidence of indebtedness passed to petitioner. The borrower was an ex-bootlegger who had had alcohol dealings with petitioner. He had been convicted of hijacking and also for transportation of alcohol. $5,000 of the alleged loan is claimed to have been loaned and used to pay a gambling debt. Schultz testified, in part, that the $5,000 "was money that I lost gambling and I owed it to [Whetstine], so I came to Tom and asked him for $5,000. He told me it was under one consideration, if I quit gambling, he says I will advance you this money." The testimony of Schultz himself makes it clear that he did not intend to give up gambling, and, in fact, that he supported himself and his wife for several years by this means. We need not extend our discussion of the Schultz item to support the view that we reach the same conclusion, and for the same basic reasons, which we reached as to the alleged receivables and alleged repayments already discussed. Opinion Following Leads We find no merit in petitioner's argument to the effect that under Holland v. United States, supra, leads which were available to respondent and his agents well before the instant trial were *203 disregarded. We have already set forth in part the facts relating to following leads in connection with our findings relevant to the issues of cash on hand and receivables. At no time during the investigation of petitioner for the years 1920 to 1933, inclusive, did the agents involved in the investigation find any suggestions regarding cash on hand or accounts receivable now claimed by petitioner. Similarly, in the course of the investigation of Banks for the taxable years involved herein, the revenue agents assigned to the case made a proper search, without success, for currency or accounts receivable due and owing to Banks as of December 31, 1936. To the extent, if any, that there was material information showing the existence and amount of cash and receivables, the control of such information was in the petitioner who resisted rather than aided the development of any such information. In the instant case petitioner did not offer any leads or make any reasonable explanations inconsistent with guilt at any time prior to or during his criminal trial for income tax evasion. When petitioner was examined in the instant case (as an adverse witness) by respondent's counsel as to the reasons *204 for his failure to furnish information, petitioner replied in part: "A. But in the bootlegging days nobody was coming up with what they - for certain reasons you would certainly have been putting the finger on yourself." Later when he was asked whether he was concerned at all about having such information turned over to the Government, he answered: "A. Well, in my criminal trial, yes." We do not think that petitioner's vague allusion to receivables which he made in open court at the time he was sentenced in his criminal trial was a "relevant lead" susceptible of being tracked down by respondent. No details were offered at that time as to any of the receivables in dispute which petitioner's counsel now has endeavored to correlate with petitioner's vague statement. It was only through "forced pleadings," and as a result of an order of this Court that petitioner belatedly furnished to respondent the names of the alleged debtors and purported to furnish the addresses of three of them who were still alive. In conferences held in the summer of 1958 looking to agreement to stipulate facts, petitioner's counsel was asked for information relating to assets that he had as of the opening of the *205 instant net worth period which he would claim at the trial. Petitioner's counsel (Maun) replied that he would furnish such information in court. After the criminal trial, petitioner's accountant, Zimmerman, a former revenue agent, allegedly discussed the question of receivables with Agent Hanson (now deceased) who had never been associated with the Banks case. Zimmerman admitted that he knew Hanson had not been assigned to the case, and that he never furnished any leads or information to any agent who was working on petitioner's case. We also note that Special Agent Malone discussed petitioner's entire case with him when he saw him in prison, and petitioner did not mention anything relating to receivables. Nor did O'Gordon, in his discussions with Malone, ever tell the agent anything about a cash hoard or receivables owing to petitioner. In June 1958, Malone independently discovered Banks was planning to claim at the instant trial that he received repayments on substantial loans from Michael O'Connor. The Government received no assistance from petitioner or his counsel in locating Robert O'Connor (Michael's brother) for interrogation. Malone testified that at a conference with petitioner's *206 counsel Maun and Coffey in 1958 they were asked for information concerning, among other items, the so-called receivables, and petitioner's counsel (Maun) stated he would deal with that matter in court, and that he (Malone) got the first information about the alleged receivables from petitioner's representatives about two weeks before the start of the instant trial. It is clear that Banks was represented by competent counsel and an able accountant, all of whom knew the problems inherent in a net worth case, and none of whom furnished any leads to be followed in the investigation. Vague assertions about a cash hoard or receivables are hardly in the category of "relevant leads" referred to by the Supreme Court in the Holland case. Petitioner remained quiet at his peril. We think the Government agents exhausted all material leads furnished them and we find no justification for criticism. The obvious fact as indicated above, is that if there were any such leads, Banks had as great (or greater) opportunity to follow them up as did the agents. Petitioner had every opportunity at the trial of the instant case to produce all available evidence as to cash on hand and receivables. In Holland v. United States, supra, *207 the Supreme Court said, in part, (p. 137): But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. * * * See also Kampmeyer v. United States, 227 F. 2d 313, 316-317 (C.A. 8, 1955). Under the circumstances, we believe there can be no question but that respondent fully complied with the requirements of Holland v. United States, supra. We observe petitioner also urged in the appeal of his criminal tax case that respondent failed to follow up leads, and that the Court of Appeals held that respondent had fully complied with the Holland case in this respect. Banks v. United States, 223 F. 2d 884 (C.A. 8, 1955), certiorari denied 350 U.S. 986 (1956). Findings of Fact Mohawk Liquor Corporation Stock (Item 10A) In reconstructing the increase in Banks' net worth for the years 1937-1947, inclusive, respondent included the amount of $750 as the cost of Mohawk Liquor Corporation stock for the taxable years ended December 31, 1941, through December 31, 1945. It is stipulated that said stock was purchased by petitioner in June 1937 for $750, but was registered *208 in the name of A. M. Cary. It is further agreed that petitioner retained said stock through December 31, 1945, as reflected on respondent's net worth schedule. Opinion Mohawk Liquor Corporation Stock (Item 10A) Petitioner (in his reply to second amendment to answer) concedes that the Mohawk Liquor Corporation stock had a cost basis to him in the amount of $750. He alleges, however, that said stock was not acquired in 1941, as determined by respondent, but rather in 1936. We hold, infra, that the years 1937 to 1940, inclusive, are barred by limitations. No additions to tax for fraud are applicable to the year 1941. Under the circumstances, the burden of proving the correct date of acquisition of said stock rests with petitioner who has failed to produce evidence to support his contention. We hold for respondent on this item. Findings of Fact Insull Utilities Investment (Item 10B) It is stipulated that between 1930 and 1932, petitioner acquired Insull Utilities bonds at a cost of $6,994.79. When returns were prepared for petitioner for each of the years 1920, and 1923 through 1933, inclusive, by the then deputy collector of internal revenue for the district of Minnesota, petitioner *209 was allowed a partial bad debt charge-off in 1932 in the amount of $3,497.39. Petitioner reported the sale of his Insull Utilities bonds in his Federal income tax return for the year 1939 indicating the cost as $6,994.60, gross sale price as $1,260, loss as $5,753.60, and loss to be taken into account $2,867.30. Thereafter, a revenue agent audited petitioner's return for 1939 and the cost basis of said bonds was reduced by 50 percent to correspond with the amount of $3,497.39 which had been charged off in the taxpayer's return for the year 1932. In the aforesaid agent's report, petitioner was allowed a (net remaining) cost basis on the Insull bonds in the amount of $3,497.40, which is identical with the amount allowed by respondent on his net worth schedule as of December 31, 1936. In his protest involving the years 1938 and 1939, petitioner did not challenge said adjustment to the investment in the Insull Utilities bonds. Thereafter, petitioner signed a waiver of restrictions on assessment and collection (Form 870) for the years 1938 and 1939. Respondent shows the amount of $3,497.40 with respect to the cost basis of said bonds for the year ended December 31, 1936, on his net worth *210 schedule (Item 10B). Opinion Insull Utilities Investment (Item 10B) We disagree with petitioner's contention that the correct basis of the Insull bonds as of December 31, 1936, was $6,994.79. Petitioner was allowed the benefit of a partial bad debt charge-off in 1932 in the amount of $3,497.39, leaving a remaining basis of $3,497.40 as of December 31, 1936. We hold for respondent on this item. Findings and Opinion Worthless Securities Petitioner stated in the affidavit dated July 2, 1937, submitted to compromise his alcohol tax liability, that he had stocks in his possession which were worthless as follows: 60 shares
Central Public Service
300 shares
American Eagle Aircraft Corporation
55 shares
Corporation Securities Company [of
Chicago]
300 * shares
Kreuger and Toll Company
52 shares
Foote Bros. Gear and Machine Com-
Company
This information originated with petitioner. The securities above listed were investigated by a revenue agent at the time the affidavit was submitted and were found to be worthless as stated. American Eagle Aircraft stock became worthless in 1932 or 1933. Petitioner's stock in Foote Bros. Gear and Machine Company was not submitted for an exchange in connection *211 with the reorganization of the company and, therefore, this stock became worthless prior to December 31, 1936. The Corporation Securities Company of Chicago stock became worthless in 1933. Central Public Service Corporation stock became worthless in 1932. Since all of the securities above referred to became worthless prior to December 31, 1936, they are not includible in net worth as of that date. Findings and Opinion American Commonwealth Power Bond Petitioner claims that prior to the opening net worth period he owned a $1,000 bond of American Commonwealth Power Co. The company went into receivership in 1932. His claimed cost was $987.60. On final liquidation, holders of such bonds received $3.65 per thousand. Petitioner has failed to offer satisfactory evidence establishing cost or proving that the bond was other than worthless as of December 31, 1936. Under the circumstances, no amount is includible in net worth as of December 31, 1936. Findings and Opinion Old Peoria Company, Inc. (Item 10BB) Petitioner claims that as of December 31, 1936, he owned stock in Old Peoria Company, Inc., which cost him $12,500. The stock was in the name of Archie Cary, a lawyer, now deceased. Petitioner *212 sold the stock on September 15, 1940, for $21,500 and the resultant capital gain was reported by petitioner in his 1940 return. We are satisfied by the evidence that petitioner bought the stock for $12,500 in 1935 and that petitioner continued to own it until 1940, when he sold it, even though during part of the intervening period it was carried in Cary's name. We hold, therefore, that the stock is includible in petitioner's assets as of December 31, 1936, in the amount of $12,500. Findings of Fact Associated Gas and Electric Company Petitioner claims that Reta owned 21 shares of Associated Gas and Electric Company stock as of 1936. The stock was selling at $2.25 per share on December 31, 1937. Opinion Associated Gas and Electric Company Except for the fraud issue, the burden of proof is upon petitioner to prove the cost or other basis of the stock, its selling price, and the year in which sold, if it was in fact sold. If it became worthless, petitioner must prove that fact and the year of worthlessness. While petitioner alleges in his reply to second amendment to answer that the cost of the stock was $900.90, he has offered no evidence to support such claim. Likewise, he has failed *213 to prove the year of sale and selling price if it was sold, or the year of worthlessness if it became worthless. We hold, therefore, that the item is not to be included in petitioner's assets as of December 31, 1936, in computing net worth. On the fraud issue, however, respondent has the burden, which he, too, has failed to sustain. We will, therefore, give no consideration adverse to petitioner with respect to this item in determining the fraud issue. Findings of Fact Rubin Shetsky (Item 10D) Respondent, in his computation of petitioner's increase in net worth included the amount of $5,000 in petitioner's assets for the years ended December 31, 1945, through December 31, 1947, representing the amount advanced by petitioner as collateral for a bond posted for Rubin Shetsky. Shetsky was indicted on August 1, 1945, by the grand jury of Hennepin County for the crime of second degree murder for shooting Albert Schneider. Shetsky pleaded not guilty. On August 6, 1945, Shetsky, as principal, and Western Surety Company, as surety, executed a bail bond in the penal sum of $20,000 to secure Shetsky's appearance for the trial. On August 8, 1945, A.M. Cary transmitted the sum of $20,400 to the *214 Walter Lemon Agency of the Western Surety Company as collateral for its bond No. 233907, posted for Shetsky. Of said amount of $20,400, the sum of $5,000 was advanced by petitioner herein and given to Cary for the purpose above stated. Petitioner was part owner of the Casablanca Cafe of which Shetsky was the manager at the time of the shooting incident involved herein. The trial upon the indictment began on September 10, 1945, with Shetsky in attendance, but, before the State's case against him had been completed, Shetsky, on September 24, 1945, fled the jurisdiction. On September 24, 1945, the District Court entered an order adjudging the bail forfeited. On October 10, 1945, the Western Surety Company, pursuant to Minn. Stat. Ann., Section 629.58, petitioned and moved the District Court for an order authorizing and directing it to pay into the Court the amount forfeited under the bail bond and to be forever discharged of its obligation. Notice of this motion and an order to show cause why such motion should not be granted was served upon the attorneys for Shetsky who, however, did not appear to contest the motion. On October 11, 1945, the District Court issued an order authorizing *215 and directing the surety company to pay the $20,000 to the Clerk of the District Court. The surety company complied with the order on the date of its issuance and the Clerk of the District Court paid the money to the Treasurer of Hennepin County on October 31, 1945. The trial resumed on October 15, 1945, in Shetsky's absence, and on October 17, 1945, the jury returned a verdict of guilty. On June 6, 1946, Shetsky was sentenced in absentia to life imprisonment. Shetsky remained a fugitive from justice until March 1947, when he was apprehended in California and subsequently delivered to a state prison. After being returned to Minnesota, Shetsky remained incarcerated in the state prison until 1949 when the Supreme Court of Minnesota determined in a habeas corpus proceeding on February 21, 1949, that sentencing him in absentia denied him the protection of due process of law and ordered that he be returned to Hennepin County for resentencing. State ex rel Shetsky v. Utecht, 36 N.W. 2d 126 (Minn. 1949). After being resentenced to imprisonment for life on March 4, 1949, Shetsky moved for a new trial, which motion the trial court denied, but the Supreme Court of Minnesota granted on December *216 23, 1949. State v. Shetsky, 40 N.W. 2d 337 (Minn. 1949). After getting the venue of the trial changed to McLeod County, Minnesota, he was tried and found not guilty on May 25, 1950. On November 29, 1950, the surety company "for value received" assigned to Shetsky all its rights to the bail money which it, pursuant to the District Court's order, had paid to the Clerk of the Court of Hennepin County on October 11, 1945. On December 21, 1950, Shetsky petitioned the District Court of Hennepin County to vacate the order of September 24, 1945, forfeiting the bail money and to remit the bail money less expenses and disbursements incurred by the county in apprehending and returning him to Minnesota. The State District Court denied Shetsky's petition on January 29, 1951. On appeal to the Supreme Court of Minnesota, it was held on June 22, 1951, that the District Court did not have jurisdiction to rule on the merits and should have dismissed the petition since the petition had not been served upon the party (the County) having possession of the bail money. Application of Shetsky, 48 N.W. 2d 518 (Minn. 1951). On August 25, 1951, Shetsky again filed a petition for vacation of the order forfeiting *217 the bail money and for remission of the bail money. On October 25, 1951, the State District Court denied the petition. The Supreme Court of Minnesota held on June 19, 1953, that the State District Court had inherent discretionary power to grant or refuse to grant a remission of bail money, and that the Court was within its discretion in refusing to grant a remission in the instant case. Application of Shetsky, 60 N.W. 2d 40 (Minn. 1953). Shetsky has never been financially able to pay back the bail bond. Shetsky did not know Banks had put up part of the security for the bail bond. Opinion Rubin Shetsky (Item 10D) Petitioner contends respondent has erroneously included on his net worth statement a loan receivable from Shetsky, in the amount of $5,000 as of December 31, 1947, and that petitioner, in fact, is entitled to a deduction of said amount during the taxable year 1945. It is petitioner's view that the $5,000 bail bond contribution was either a deductible business expense in connection with a defense of an employee of a business in which petitioner had a proprietary interest, or a loan which was totally worthless by the end of 1945 since Shetsky had no assets with which to repay *218 the amount advanced and the bail bond collateral was forfeited to the state when Shetsky fled the jurisdiction of the trial court in 1945. Respondent, on the other hand, maintains that since the state district court had inherent discretionary power to grant or refuse to grant a remission of bail money, petitioner's advance of the $5,000 toward the bail bond was not worthless until the state district court had exercised its discretionary power, which, in this instance, was not until October 25, 1951, at which time it refused to grant a remission of the bail money. Alternatively, respondent contends that the payment of $5,000 constitutes an additional nondeductible personal expenditure of petitioner for the year in which it was made and, therefore, such expenditure should be treated on petitioner's net worth schedule in the same manner as, but in addition to, living expenses and should be added to petitioner's increase in net worth for 1945. Since we agree with respondent's alternative contention, there is no occasion for us to discuss his original contention. There was no agreement between Banks and Shetsky which would give rise to the creation or existence of a debtor-creditor relationship. *219 After the shooting at the Casablanca Club in 1945, Shetsky never asked petitioner for any financial assistance, or to put up bail or furnish security for bail. Shetsky never saw petitioner until the instant trial. Shetsky did not know that petitioner had anything to do with advancing money toward his bail bond. Banks was not in the business of advancing funds for bail bond purposes, and such a contribution, under the facts involved herein, cannot be considered as an ordinary and necessary business expense of petitioner. A payment made without consideration, a gift, or voluntary contribution, can in no way supply the basis for the deduction of the amount so paid or contributed as a loss incurred in a trade or business. Personal expenses cannot be deducted under the guise of losses, or on the ground that they are somewhat related to one's trade or business. It is axiomatic that a deduction is allowable in determining income tax only where there is a clear provision therefor. See Balch v. Commissioner, 129 F. 2d 472 (C.A. 6, 1942), affirming 44 B.T.A. 269 (1941). Under the circumstances we conclude that petitioner's advance of $5,000 to Shetsky constituted a nondeductible personal expenditure *220 in 1945 (in addition to living expenses) and, therefore, should be added to petitioner's increase in net income for that particular year on his net worth schedule. See Schedule C. Findings of Fact H. G. Lee (Item 11) Respondent, in his computation of petitioner's net worth, included as a loan receivable the sum of $5,000 for each of the taxable years December 31, 1945, through December 31, 1947, with respect to an item designated H. G. Lee. On July 7, 1945, a check in the amount of $5,000 was issued by the Blue Goose Resort, Inc., and made payable to Reta Banks. This check bears the endorsement of H. G. Lee and represents a payment in the amount of $5,000 made to H. G. Lee, who is a brother of Reta. In question No. 4 of the written questions prepared by Special Agent McKusick and submitted to petitioner through his attorney, O'Gordon, it was asked whether the aforesaid check represented a loan to H. G. Lee or a transfer of funds for some other purpose. The answer given in writing to McKusick on February 1, 1951, was "loan to Hardy Lee, still outstanding." Respondent's net worth schedule contains a typographical error in connection with Item 11, entitled H. G. Lee. The amount for *221 the year ended December 31, 1945, should be $5,000 rather than $500 as stated in the net worth schedule. At the trial, petitioner's counsel stipulated to the correction of the typographical error with the understanding that petitioner denied the inclusion of an asset in the amount of $5,000 for the year ended December 31, 1945, as to said item. Opinion H. G. Lee (Item 11) Petitioner contends he did not have a loan receivable in any amount due him from his brother-in-law, H. G. Lee, at the end of 1945, 1946, or 1947. In essence, petitioner argues on brief that in December 1944, H. G. Lee received from Weinstock, as trustee, the sum of $10,000 in cash which had been deposited with Weinstock by Lee in October 1944 in connection with the proposed purchase of an interest in the Magic Bar stock; that in 1945, Lee left $5,000 of this cash with his sister, Reta, whom he was then visiting in Minneapolis, to hold for him until he called for it after he completed a trip back to California; and that subsequently, at his request, Reta returned this money to him by sending him a check in the amount of $5,000 drawn on the bank account of the Blue Goose Cafe. We have carefully considered Lee's testimony *222 with respect to the $5,000 in question and find it unconvincing. We react in the same way to the testimony of his sister. Of course, the fact that Lee withdrew cash from Weinstock, acting as trustee, is not inconsistent with borrowing funds from petitioner. In any event, considering the general reluctance of petitioner to furnish information to the agents, we can see no reason why petitioner, when the matter was called to his specific attention by a written question, would have answered in writing (and to the effect that there was a loan to Lee, still outstanding, i.e., in 1951) unless the statement was carefully considered and true. We, therefore, hold for respondent on this item. Findings of Fact Phoenix and Quality Drug Companies (Item 13A) Petitioner reported income from the Phoenix and Quality Drug Companies on his returns for the years 1942 through 1946, as follows: Year
Amount
1942 - Phoenix Drug Store - Minneapo-
lis
$1,868.65
1943 - Quality Pharmacy - Phoenix Drug
7,112.55
1944 - Quality and Phoenix Drug Store
$1,384.33
1945 - Quality Pharmacy
1,561.38
1946 - Quality Drug Company - Minne-
apolis
306.00
The Phoenix Drug Company commenced operation in 1941 and the Quality Drug Company commenced *223 operations in 1943. The Phoenix Drug Company ceased operation during World War II. The Quality Drug Company was closed in 1949. Opinion Phoenix and Quality Drug Companies (Item 13A) Respondent argues on brief "that petitioner had an investment in the Phoenix and Quality Drug Companies in the amount of $2,500 in the year 1943, and $3,750 for the years 1943 through 1949." This represents an asset which does not appear on respondent's net worth schedule and is claimed to be in addition to the receivables in identical amounts set up in Item 13 of respondent's net worth schedule. Item 13 shows a loan receivable from Quality Drug Company in the amount of $2,500 as of December 31, 1944, and the amount of $3,750 as of December 31, 1945, through December 31, 1947. Respondent contends that Harry Shepard advanced $5,000 one year and an additional $2,500 in the following year toward the Phoenix and Quality Drug Companies, and that one-half of said amounts represented an investment of petitioner therein. Petitioner does not dispute the amounts or the existence of the receivables in Item 13 as set forth in respondent's net worth statement, but contends that respondent is attempting to deplicate *224 the investment by giving it two names, i.e., Phoenix and Quality Drug Companies. Petitioner admitted that he was a partner with Shepard or had a proprietary interest in both drug companies. As set forth in our findings, he reported income from both companies in 1943 and 1944. Weinstock, who kept petitioner's records of his varied enterprises during the taxable years involved, testified that the advances made through Shepard represented an investment by both Shepard and petitioner in both drug companies. The evidence on this issue is quite vague and confusing, with the burden of proof resting with respondent. We find no satisfactory evidence to support an inference that petitioner made two investments of $3,750 each in the drug companies. Under the circumstances, we hold for petitioner on this item. Findings of Fact T. E. Ewing (Item 14) Respondent, in his computation of petitioner's increase in net worth, included for each of the taxable years December 31, 1944, through 1947, inclusive, the sum of $10,000, representing a loan receivable from T. E. Ewing. In question No. 26 of the written questions submitted to petitioner through his attorney, O'Gordon, it was asked whether petitioner *225 had any loans outstanding to organizations designated on the books of Casanova Bar, Inc., as Casanova Bar, or Casanova Restaurant. The answer given was "Yes." It was also asked if petitioner had any loans outstanding to Thomas E. Ewing or Florence Ewing. If so, petitioner was asked to state the date and amount of advances. The written answer given by petitioner on February 1, 1951, was "$10,000 about September 30, 1944." At the time of the grand jury hearing involving Banks in 1952 for income tax evasion, Ewing informed Weinstock that he had borrowed $10,000 from petitioner. Petitioner, on re-cross-examination, admitted making personal loans to Ewing. He would not deny making personal loans to Tom Ewing as follows: Date
Amount
June 30, 1934
$ 2,200
February 28, 1935
2,200
April 30, 1945
1,500
July 31, 1945
3,000
July 31, 1945
10,000
March 31, 1946
900
The Casanova Bar had notes payable to individuals for the period June 30, 1944, to June 30, 1948, inclusive, as follows: Date
Amount
June 30, 1944
$17,000
June 30, 1945
21,950
June 30, 1946
21,400
June 30, 1947
21,400
June 30, 1948
21,400
The Casanova Bar also had notes payable to Ewing for the period June 30, 1945, to June 30, 1948, as follows: Date
Amount
June 30, 1945
$ 2,200.00
June 30, 1946
10,125.00
June 30, 1947
$10,125.00
June 30, 1948
9,778.56
*226 The Casanova Bar also had considerable amounts of other notes payable to specified individuals and banking institutions. In addition, the Casanova Bar had considerable accounts payable during this period. Opinion T. E. Ewing (Item 14) Petitioner contends that the $10,000 loan receivable shown as Item 14 in respondent's net worth schedule as being due him from T. E. Ewing is the same $10,000 loan carried on the books of the B & S Company as a receivable from the Casanova Bar and Restaurant. B & S Company appears as Item 41 on respondent's net worth statement representing an "investment in operating companies" in the amount of $3,400 as of December 31, 1943, and $11,574 as of December 31, 1947. It is petitioner's position that he owned 50 percent of the B & S Company, which was formed with Harry Shepard for the purpose of making loans to individuals such as Ewing and others; and that the $10,000 in question was not due to Banks personally, but was owed to B & S Company. In short, petitioner avers that the loan involved herein was from B & S Company to T. E. Ewing, not from petitioner in his individual capacity; and that Ewing, in turn, loaned the $10,000 to the Casanova Bar, which *227 he operated. This contention was raised for the first time in petitioner's second amendment to reply to second amendment to answer. We believe this dispute is but another instance where petitioner belatedly is claiming that information which he previously furnished the Federal Government was not truthful or accurate. In response to written questions submitted to petitioner through his attorney, petitioner stated in writing on February 1, 1951, that he had a loan outstanding to Thomas E. Ewing or Florence Ewing in the amount of $10,000 which had been advanced on September 30, 1944. Petitioner, on brief, now urges that this answer was not accurate because the $10,000 that Ewing supposedly owed petitioner was actually owed to B & S Company. The record shows, as set forth fully in our findings, that on several occasions petitioner personally made loans to T. E. Ewing. At the time of the grand jury hearing in 1952 involving Banks for income tax evasion, Ewing informed Weinstock that he had borrowed $10,000 from petitioner. Weinstock testified before said grand jury hearing that a loan from petitioner in the amount of $10,000 to T. E. Ewing was outstanding, and that Ewing used the money *228 in the Casanova Bar, which he operated. Weinstock also testified before said hearing that petitioner had loans outstanding to the Casanova Bar and Restaurant. At the instant trial Weinstock was unable to state whether or not the alleged loan from B & S Company to Casanova Bar was the same loan from petitioner to T. E. Ewing as the one he testified to before the grand jury. The basis of petitioner's argument that he did not personally own a loan receivable from T. E. Ewing in the amount of $10,000 during the years 1944 through 1947, inclusive, was that a ledger sheet had been discovered which showed that B & S Company had loaned $10,000 to the Casanova Bar. Considering the other facts of record, we do not think this ledger sheet requires a conclusion that Ewing was not personally indebted to petitioner in the amount of $10,000. Petitioner's answers in 1951, his testimony on re-cross-examination at the trial, and Weinstock's testimony satisfy us that Ewing had personally borrowed $10,000 from Banks, whether or not Ewing used it for Casanova Bar operations. It may be added that it is not unlikely that loans of $10,000 were made to Ewing by both petitioner and B & S Company. We conclude *229 that the affirmative facts support respondent's position on this item. Findings of Fact Harold Siegel and Howard Gelb (Item 19) Respondent, as reflected in his net worth statement, determined that during the year 1947 petitioner sold the Oneida Building to Harold Siegel and Howard Gelb and as part of the consideration acquired a contract for deed (designated as Harold Siegel and Howard Gelb, Item 19) with a face value as of December 31, 1947, in the amount of $32,358.33. On October 29, 1947, said building was sold by petitioner to Siegel and Gelb for $45,000. Real estate commissions and expenses on the sale amounted to $2,250. Depreciation was allowed from December 31, 1946, to the date of the sale in the amount of $440.09, and the adjusted cost basis of the property on October 29, 1947, was $19,982.53. The purchasers paid $12,500 cash down and entered into a contract for deed with petitioner and his wife for the balance in the amount of $32,500. The contract for deed provided for monthly payments of $250 per month, including interest at four percent. One payment of $250 was made prior to December 31, 1947, of which $108.33 was applied to interest, and $141.67 was applied to principal. *230 The face amount due and owing on the contract for deed as of December 31, 1947, was $32,358.33. During the year 1948 the sum of $27,425 was accepted from the purchasers in full payment and discharge of the balance due and owing on the aforesaid contract for deed, which had a face amount due of $32,358.33. In March 1948 when petitioner filed his return for 1947, he reported a selling price on the Oneida property in the total amount of $45,000, which did not recognize any discount on the aforesaid contract for deed, but, rather, showed the transaction at the face selling price. Item 62 of respondent's net worth statement consists of a piece of real estate known as the Oneida Building, which was purchased in 1944 in the name of petitioner and his wife, as joint tenants. Said building had an adjusted cost basis to petitioner on December 31, 1946, of $20,422.62. Opinion Harold Siegel and Howard Gelb (Item 19) Petitioner contends that on December 31, 1947, the fair market value of the contract for deed in the face amount of $32,500 which he and his wife received as the balance of the sale of the Oneida Building in 1948 was $27,425. The sole issue here is whether said contract for deed should *231 be shown on the net worth schedule of petitioner as of December 31, 1947, at its face value in the amount of $32,358.33, as determined by respondent, or at a discounted amount, i.e., $27,425, which was subsequently received during 1948, a year which is not involved herein. It is stipulated that the face amount due and owing on the contract for deed given to Banks as of December 31, 1947, was $32,358.33. It is our view that, as of December 31, 1947, the contract for deed must be shown on the net worth schedule at the balance of its face value, $32,358.33. The terms of the contract are sufficient to support this view in the absence of any reason to adopt a lower figure. There is no evidence to show that the fair market value of the contract for deed as of the end of 1947 was less than $32,358.33. Taxation is based on annual accounting in which each year is treated as a separate entity. It is clear that petitioner did not receive the discounted amount of $27,425 from the purchasers in discharge of the balance due and owing on the contract for deed until the year 1948. The purpose of petitioner in selling at a discount in 1948 is conjectural, and he may well have had reasons of his own *232 for the disposition of the contract in 1948 which did not reflect upon the then fair market value, or upon such value in 1947. Upon consideration of the evidence, we hold for respondent on this item. Findings of Fact Brady's Bar (Item 21) At the trial, respondent, pursuant to the provisions of section 272(e) of the 1939 Code, filed a claim for increased deficiencies on the basis of a correction to Item 21 entitled Brady's Bar. In implemention of the claim, on July 16, 1959, respondent filed a third amendment to answer correcting Item 21, Brady's Bar, to show a negative figure of $6,934.42 for the year ended December 31, 1941, and for the year ended December 31, 1942, a negative figure of $7,434.42. No change was made for the year ended December 31, 1943, which is shown on the respondent's net worth schedule as a plus figure of $9,240.10. In said amendment to answer, respondent claimed, in the notice of deficiency, that he had understated petitioner's net income subject to Federal tax for the year 1943. He alleges the correct net income for 1943 should be $101,861.77, and hence, that the correct deficiency in income and victory tax, addition to tax under sections 293(b) and 294(d)(2) *233 should be $62,463.71, $31,231.86, and $3,295.86, respectively, in lieu of the respective amounts of $49,450.03, $24,725.02, and $2,515.04, originally determined. The books and records of Brady's Bar could not be located. In the year 1946, Revenue Agent Kleven made a transcript of the books and records of Brady's Bar. The entry on January 1, 1942, shows that Brady's Bar held an account receivable from petitioner in the amount of $6,934.42. Likewise, the entry on January 1, 1943, shows that Brady's Bar held an account receivable from petitioner in the amount of $7,434.42. Subsequently, on June 30, 1943, Brady's Bar received $9,240.10 from petitioner as a loan. Later, on October 31, 1943, Brady's Bar received $7,434.42 from petitioner which was set off against the figure of $7,434.42 showing a balance as of January 1, 1943. The two figures in the amount of $7,434.42 were correctly set off against each other, and the Brady's Bar transcript shows a credit balance of $9,240.10 due Banks as of December 31, 1943. In transcribing said information from the transcript into his revenue agent's report in 1946, Agent Kleven had failed to place a parenthesis around the negative figures relating *234 to Brady's Bar for the years ended December 31, 1941, and December 31, 1942. At the criminal trial of petitioner for income tax evasion, the figures for the years ended December 31, 1941, and December 31, 1942, were corrected to show that they were in parenthesis as negative figures. At the instant trial, petitioner's counsel conceded, in connection with Brady's Bar, Item 21, of respondent's net worth schedule, that the asset figure for the year ending December 31, 1943, in the amount of $9,240.10 is correct. Opinion Brady's Bar (Item 21) The statutory notice in the instant case was issued prior to the criminal trial of petitioner (at which time the figures relating to Brady's Bar for the years ended December 31, 1941, and 1942, were corrected to show that they should be in parenthesis as negative figures) and at the time the statutory notice was issued the revenue agent's error had not been discovered. When respondent filed his second amendment to answer, he attached thereto as Exhibit A, the original net worth schedule which was the basis of the 90-day letter, and which contained the same error with respect to Item 21 designated as Brady's Bar. The transcript of the books and records *235 of Brady's Bar showed that as of December 31, 1942, Brady's Bar had a receivable due from petitioner in the amount of $7,434.42. On June 30, 1943, Brady's Bar received a loan of $9,240.10 from petitioner. On October 31, 1943, Brady's Bar received $7,434.42 from petitioner, which was set off against the receivable in the same amount reflected as a balance as of December 31, 1942. Since the two figures in the amount of $7,434.42 were properly set off against each other, the Brady's Bar transcript correctly shows a balance of $9,240.10 as of December 31, 1943, owing from Brady's Bar to petitioner. We are satisfied that the amounts in Item 21, Brady's Bar, for the taxable years ended December 31, 1941, and 1942, should have been shown in parenthesis as negative amounts. It is apparent that the misstatement of the Brady's Bar item erroneously overstated petitioner's net worth as of December 31, 1941, and 1942, in the respective amounts of $13,868.84 and $14,868.84. We are also satisfied that the asset figure of $9,240.10 as of October 31, 1943, is correct. In view of the facts with respect to the negative items in 1941 and 1942, it is clear that it is necessary to adjust petitioner's over-all *236 net worth for the year ended December 31, 1943. The adjustments are accordingly reflected in our Schedule C. The ultimate disposition of respondent's request for increased deficiencies for the year 1943 will be determined under Rule 50. Findings of Fact Daily Mail (Item 26) Respondent, in computing the increase in petitioner's net worth, shows an investment in the Daily Mail, a newspaper, in the amount of $10,000 for the year ended December 31, 1947. Weinstock maintained a bank account in which he deposited all money that was turned over to him by any client for any purpose, or any escrow money that was to be kept separate from his own personal account. Part of the money deposited in this bank account was characterized as a "trustee account for Tom Banks, Reta Banks, Casablanca and others." Other money deposited in this account was designated as a "trustee account for William Donnely." On October 30, 1947, $5,000 in cash was deposited in the bank account and was entered on Weinstock's records in the account known as "Leonard H. Weinstock trustee account with T. W. Banks, Reta Banks, Casablanca, Inc. and others." On the following day, October 31, 1947, a check in the amount of $5,000 *237 was drawn on the aforesaid account to Leonard Welsh, Treasurer of the Daily Mail. This amount was entered on Weinstock's records as a withdrawal from his account as trustee for Banks, et al. On November 29, 1947, a check in the amount of $5,000 was drawn on the account and was entered on Weinstock's records as a withdrawal from his account known as "Leonard H. Weinstock trustee for William Donnely." The check was payable to Leonard Welsh. Prior to the issuance of one of the checks payable to Leonard Welsh, Harry Shepard turned over $5,000 to Weinstock in cash. Shepard instructed Weinstock to issue a check to Welsh in that amount in the Daily Mail matter, and Weinstock issued the check accordingly. Opinion Daily Mail (Item 26) Respondent, in his net worth schedule, shows an investment in the Daily Mail, a newspaper, in the amount of $10,000 for the year ended December 31, 1947. Petitioner's counsel conceded that Banks had an asset entitled "Daily Mail" in the amount of $5,000, although in his pleadings petitioner denied that he had any interest in or was owed any amount whatsoever by the Daily Mail in 1947 or any year thereafter. At the trial, petitioner contended that he had invested *238 only $5,000 in the Daily Mail during 1947 and that Harry Shepard, a business associate, had invested a like amount in the venture; that said investment was worthless as of December 31, 1947, and, hence, that respondent overstated by $10,000 petitioner's investment in the newspaper as of the end of 1947. As to the admitted investment of $5,000 in the Daily Mail, petitioner does not claim he sold or otherwise disposed of his interest. He claims, rather, that it was worthless as of December 31, 1947. Our examination of the record satisfies us that the evidence does not sustain this contention. As indicated above, petitioner admits he had an investment of $5,000 in Daily Mail, but claims that the remaining $5,000 interest in issue was that of Harry Shepard. While, as we have already stated, petitioner is not a credible witness, in this instance, the surrounding circumstances, which we have examined with care, are not inconsistent with petitioner's testimony and lend some color to the truth thereof. After careful consideration, we hold that the asset item of $10,000 relating to the Daily Mail issue must be reduced to $5,000. Findings of Fact E. A. Jefferds (Item 26A) Respondent, in his *239 net worth schedule implementing his determination, included as an asset of petitioner a loan receivable from E. A. Jefferds in the amount of $5,000 as of the end of December 31, 1943, through December 31, 1947, inclusive. E. A. Jefferds was in the real estate business in Minneapolis. Petitioner loaned money to Jefferds "many a time." Opinion E. A. Jefferds (Item 26A) Petitioner contends that he did not have $5,000 or any amount due him from Earl Jefferds as of the end of 1943 through 1947. The burden of proving error in respondent's determination rests with petitioner. At the instant trial, Revenue Agent Kleven testified that said item was included in respondent's net worth statement on the basis of information obtained by McKusick (now deceased), and that he (Kleven) could not personally testify with respect to the Jefferds' receivables. Kleven's testimony to the effect that he did not think the item should be included in petitioner's net worth is not binding on respondent. Petitioner's testimony on this item was quite confusing, but he admitted he made loans to Jefferds many a time. Jefferds, who may have been able to shed some light on the loan receivable in question, was not called *240 as a witness by petitioner and his absence was not explained. We cannot assume that his testimony would have been favorable to petitioner, who bore the burden of proof. See The Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). Under the circumstances, we must uphold respondent's determination with respect to this item, but it is not a factor to be considered adverse to petitioner on the fraud issue. Findings of Fact Inventory (Item 27) Respondent, in computing petitioner's increase in net worth, determined the value of his farm inventories at the end of each taxable year as follows: Year
Amount
December 31, 1941
$ 745.00
December 31, 1942
9,128.32
December 31, 1943
12,692.10
December 31, 1944
16,922.01
December 31, 1945
16,284.25
December 31, 1946
16,389.50
December 31, 1947
20,907.01
These figures are taken from petitioner's income tax returns. The tax returns indicate that the farm inventories are based on an accrual method of accounting. Said returns reflect the market value of raised feed and grain as well as all raised and purchased animals. The 1942 and 1943 tax returns of petitioner show detailed information relating to farm inventories, including *241 inventory on hand at the beginning of each year, purchased during the year, raised during the year, consumed or lost during the year, sold during the year and inventory on hand at the end of the taxable year. Said information was furnished by petitioner or his wife as to different types of animals. Tax returns for the years after 1942 and 1943 do not show details. They merely show a total of beginning inventory and a total of all types of closing inventory without any breakdown. No detail was shown on the farm schedules on petitioner's returns for any year after 1943 because Weinstock, the accountant, was unable to trace through to determine the status of each animal. Weinstock's work sheets relating to Anoka Farms were not adequate enough to enable him to identify breeding animals or the particular animals that were sold during a particular taxable year. Weinstock personally took farm inventories in connection with the Anoka Farms on December 31, 1942, and December 31, 1943. After 1943, the farm inventories were furnished by petitioner's wife. Said inventories consisted of the number and ages of the different animals and the amount of feed, silage, hay, and grain that was on hand *242 at the end of the year. In connection with petitioner's returns, Weinstock never claimed any capital gains on the sale of breeding animals because the farm inventories were inadequate to enable him to identify the breeding animals. Some of the farm inventories taken by petitioner's wife later disappeared. Weinstock was unable to locate any of his work papers relating to farm inventory for the year 1945. Many of the basic records supporting Weinstock's farm work papers were not in existence at the time of trial. In connection with the inventory of farm animals, petitioner's wife did not furnish Weinstock any information relating to the age or the weight of the animals. When animals were sold from the Anoka Farms during the years 1942 to 1947, inclusive, petitioner's wife would furnish information to Weinstock which showed merely the weight of the animal and the sales price. Weinstock never made an audit or verified the farm inventory which was furnished to him by petitioner's wife. The farm inventories which appear on petitioner's Federal income tax returns show all animals priced at the market price (as if for sale) regardless of whether the animals were breeding animals or animals *243 held for sale for meat purposes, and regardless of whether the animals were purchased or raised animals. Opinion Farm Inventory (Item 27) Petitioner contends respondent erred in including the Anoka Farm inventory as an asset of petitioner in his net worth schedule and that, in any event, respondent overstated the amount of the farm inventory for each of the taxable years ended December 31, 1941, through December 31, 1947, in the aggregate amount of $18,171.63 by use of market values rather than cost. Essentially, it is petitioner's position that, as to all other assets in his net worth statement, respondent used cost basis in arriving at their value but that in the case of farm-grown seed, feed, and livestock, (Item 27) respondent used the inventory method taken as of the end of each calendar year at market value, and in so doing respondent has placed said farm products on an inventory basis without the consent or election of petitioner. It is well settled that farmers and livestock raisers must elect between the receipts and disbursements method or an accrual basis of reporting income and having once elected one method, they cannot change to the other method without the approval *244 of the Commissioner. Jack Frost, 28 T.C. 1118, 1120 (1957); Elsie SoRelle, 22 T.C. 459, 469 (1954); Regs. 111, section 29.22(c)-6, [3] *245 *246 29.44-2. [4] *247 Petitioner's returns show that he consistently used an accrual method of accounting with respect to farm inventories during the taxable period involved. No evidence was presented to establish that petitioner ever requested or received from the Commissioner permission to change to any method of accounting other than an accrual method. See Bernard Carter v. Commissioner, 257 F. 2d 595 (C.A. 5, 1958) where the Court of Appeals refused to permit a farmer to retroactively change his method of reporting income from an inventory basis to a cost method. Similarly, in Charles F. Bennett, 30 T.C. 114 (1958), we stated (p. 121): (b) Petitioners object to the net worth statement because "it is prepared on an accrual basis," whereas their returns were filed on a cash basis. But the net worth method is not a system of accounting (see Holland v. United States, 348 U.S. 121, 131; Morris Lipsitz, 21 T.C. 917, 931, affirmed 220 F. 2d 871 (C.A. 4); Estate of George L. Cury, 23 T.C. 305, 332-334), and, in any event, where, as here, inventories are a factor in determining net income, the use of an accrual system of accounting is mandatory. Herberger v. Commissioner, 195 F. 2d 293, 295 (C.A. 9), certiorari denied 344 U.S. 820; Blaine Johnson, 25 T.C. 123, 130, affirmed 233 F. 2d 952, 956 (C.A. 4); Treasury Regs. 111, sec. 29.41-2. * * *
We have repeatedly held that the net worth method is not a system of accounting. It is a technique, which, properly applied, furnishes evidence of income. Fundamentally (but subject to further adjustment if required, as indicated below, by special circumstances) its approach is by a comparison of net assets, at cost, at the beginning of the year with *248 net assets, at cost, at the end of the year. The net increase (subject to any necessary adjustments) is evidence of income. As examples of necessary adjustments (but not to be taken as all-inclusive) we point to the need of adding back nondeductible exenditures such as Federal income taxes, living expenses, gifts, and the like. Adjustments are necessary also to reflect only the taxable portion of capital gains. There may likewise be depreciation factors to be taken into consideration. By the same token, where there are farm inventories, an approved and consistent method of valuation over a period of years is calculated to reflect income clearly and may be used, in conjunction with the net worth method, as evidence of income. There is no inconsistency between the inventory method used by respondent and the use of the net worth technique as to other items. Here, the respondent adopted petitioner's own inventory method based on market values and took petitioner's figures from his own returns. Petitioner, of course, has produced no cost figures. Under the circumstances, respondent, we think properly, used a method known to reflect income clearly, and petitioner is not in a position to *249 complain of the adoption of both his own method and his own figures. In view of the inventory method used by respondent, and for the same reasons discussed above, we must reject petitioner's claim that respondent failed to allow any depreciation on the farm inventory herein in amounts set forth on a schedule designated as "Breeding Stock" attached to petitioner's pleadings. With respect to petitioner's contention that all farm inventory belonged to Reta exclusively and should not have been included in his net worth statement for reasons discussed infra on the same issue we hold that there is no merit in petitioner's view. In the light of the foregoing, respondent's determination with respect to Item 27 is sustained. Findings of Fact Anoka Farms (Items 28-37) and Other Items Claimed to Be Owned by Reta Items 28, 29, 30, 31, 32, 33 and 34 of respondent's net worth statement consist of lands and buildings (with equipment) known as Anoka Farms, all of which were purchased in the name of petitioner and his wife as joint tenants. At no time during the investigation of petitioner prior to the criminal trial or the instant trial, was it ever indicated to a revenue agent assigned to the case *250 that there was any objection to the inclusion in net worth of petitioner of assets in the name of Reta. In the written questions submitted to petitioner through his attorney, O'Gordon, in the first part of the question No. 2, it was asked whether the acquisition of joint tenancy assets represented investment of income by petitioner, or both petitioner and his wife. In the written answers submitted to McKusick it was stated that it represented an investment of income by "Thomas Banks." In the second part of question No. 2, it was asked whether petitioner considered his wife individually liable for cumulative net worth (as determined from assets in her name) in excess of funds available from her reported income, or did he hold himself liable for her excessive cumulative net worth. The answer given was "Reta Banks assets acquired from Thomas Banks." The first year in which petitioner reported any business earnings relating to the Anoka Farms was 1942. In that year petitioner showed a net loss from the operation of the farms. Reta did not sign this return, which was petitioner's individual return only. Losses from the Anoka Farms for the years 1942 through 1946 were all recorded on petitioner's *251 individual returns. For the year 1947, petitioner reported a gain from Anoka Farms on his individual return. The only income reported on Reta's returns for the years 1942 to 1947, inclusive, was income from the partnership known as Banks and Shepard. All services that Weinstock rendered in connection with Reta's tax returns were charged to petitioner. The money for the purchase of the Anoka Farms was given to the real estate agent from time to time by either petitioner or his wife. In most instances, however, it was given by petitioner. It was a common practice of petitioner to maintain assets which he owned in the name of his wife, or in the name of other individuals. Examples of assets which petitioner maintained in the name of his wife, which he admitted in the pleadings were assets owned by him, are as follows. The property known as 3952 Beard Avenue South, Minneapolis, Minnesota, was listed as acquired in 1930 under contract for deed in the name of petitioner's wife, Reta. The property at 3817 Drew Avenue South, Minneapolis, Minnesota, which is the home of petitioner and his wife, is listed in the name of Reta. Petitioner gave Reta money each month for the purpose of paying off *252 the mortgage on said property. The property at 5238 Excelsior Boulevard was purchased in the name of Reta. Income from said property is reported on the returns of petitioner. The capital gain from the sale of said property in 1945 was reported on petitioner's return. In the affidavit submitted to compromise the alcohol tax liability, petitioner stated that the stock in Wheel Service Company was in his wife's name. The Oneida Building was held in joint tenancy in the names of petitioner and his wife. Said property was sold in 1947 and the sale was reported in petitioner's individual return. A summer resort known as Blue Goose Resort, Inc., was listed in the name of petitioner's wife. A property known as McCarthy's Cafe (Item 40) was listed in the name of petitioner's wife. Reta reported no income or loss from McCarthy's Cafe on her tax returns. Petitioner's investment in Banks and Shepard partnership was maintained in the name of Reta. Opinion Anoka Farms (Items 28-37) and Other Items Claimed to Be Owned by Reta Petitioner has conceded the correctness of the cost basis used by respondent in connection with Items 28 to 37, inclusive, relating to Anoka Farms. Petitioner, however, avers *253 that the assets which make up the Anoka Farms were the "sole property" of his wife, Reta. It is petitioner's position, on brief, that the lands and buildings known as the Anoka Farms were purchased in his name and that of his wife, Reta, as joint tenants with funds which he had turned over to her as a gift, and, therefore, said assets are not properly includible in the computation of his net worth for any of the years involved. The record shows that all gain or loss from the Anoka Farms were [was] reported on petitioner's individual Federal returns and were not reported on Reta's individual returns. Petitioner reported losses in the operation of the farm for the years 1942 to 1946, inclusive. Petitioner's accountant, Weinstock, testified that the reason he reported all such gain or losses on petitioner's individual returns was because prior to 1951 he was never informed that the Anoka Farms were in the name of Reta. Petitioner never questioned the fact that income from assets which were in his wife's name was reported on his returns, although he knew such income was so reported. Reta was unable to explain why losses from the operation of the Anoka Farms, which she allegedly owned in *254 her individual capacity, were reported on her husband's return rather than on her own returns. The only income reported on Reta's returns for the years 1942 to 1947, inclusive, is income from a partnership known as Banks and Shepard. Weinstock testified that he advised petitioner that, unless he filed a Federal gift tax return with respect to the money which he allegedly gave his wife to purchase property in her name, such assets would undoubtedly be considered as petitioner's individual property. Nevertheless, no gift tax returns were prepared or filed. Petitioner's argument depends to some extent on Reta having a cash hoard of her own in her home for it is petitioner's contention that, in addition to his outright gifts to Reta, she made purchases of property from her own money. We have found there was no such cash hoard. Reta testified that she never worked in any gainful occupation since she married petitioner in 1915, and that her alleged wealth originated with him. In any event, irrespective of bare title, the evidence is clear that petitioner and his wife both recognized that the beneficial interest in Anoka Farms was in petitioner and not in his wife, and that gains, income *255 and losses in relation to the farms are to be attributed to him. There is no other possible explanation of petitioner's action in claiming farm losses on his returns from 1942 to 1946, and a gain in 1947, or of Reta's failure to account for any of the foregoing in her own returns. Moreover, the record makes it abundantly clear that the funds used for the purchase of the farms stemmed from petitioner and not from Reta. See Romm v. Commissioner, 245 F. 2d 730 (C.A. 4, 1957) affirming a Memorandum Opinion of this Court; Henry B. Mikelberg, 23 T.C. 342, 352 (1954), affd. per curiam, 234 F. 2d 34 (C.A. 3, 1956). Upon consideration of all evidence relating to the issue, we hold that the assets known as Anoka Farms were properly included in petitioner's net worth. Petitioner, on brief, claims that, although he originally owned the assets listed below, he transferred them to his wife prior to December 31, 1936, and had no interest in them as of that date. The properties are: Hungry Jack Lodge (Item 57), 3952 Beard Avenue (Item 52), 3817 Drew Avenue (Item 51), McCarthy's Cafe (Item 40), Blue Goose Cafe (Item 44). He makes the same claim as to Cities Service Company stock (Item 10C), except *256 that he maintains that the stock was sold by Reta in 1941. He argues, therefore, that these items should be excluded from the net worth computation. As to the Cities Service Company stock, sold in 1941, its inclusion as an asset of petitioner as of December 31, 1936, is to petitioner's advantage. As to the remaining items above referred to, petitioner admitted ownership in his pleadings. Moreover, the surrounding circumstances (as in the Anoka Farms items) tend to support respondent's position. We add that (except as to the issue of fraud) the burden of proof of error rests with petitioner, who has failed to offer any acceptable evidence to support his contention. We accordingly sustain respondent in respect of the items here discussed. Petitioner further urges, on brief, that respondent improperly included in his statement of petitioner's net worth the entire interest in the Oneida Building (Item 55), which was held in joint tenancy in the names of petitioner and his wife. He claims that she acquired her interest therein either by gift from him or by the expenditure of funds received from him prior to the beginning of the net worth period involved. Numerous assets of petitioner, other *257 than the Anoka Farms, were admittedly carried in Reta's name, examples of which are set forth in our findings. For the same reasons expressed above with respect to Anoka Farms, we hold that respondent has correctly included the Oneida Building in petitioner's net worth at its total cost. Even though the title was in joint names, the beneficial interest was in petitioner, who recognized this, and, in his reply to second amendment to answer, admitted that said building was owned by him. Moreover, petitioner reported all of the income from the building in his individual returns and, likewise, reported all of the gain in his individual return when it was sold in 1947. See also Findings, Harold Siegel and Howard Gelb (Item 19), supra. We sustain respondent on the Oneida Building item. Findings and Opinion Flour City Body Corporation (Item 42) Respondent, in his computation of the increase in net worth of petitioner, shows $4,000 as the cost basis of stock of Flour City Body Corporation for the years ended December 31, 1936, through December 31, 1947. In an affidavit dated July 2, 1937, which petitioner submitted to the Federal Government in order to compromise his alcohol tax assessment, *258 petitioner stated, inter alia, as follows: * * *
That my wife also owns one-third interest in the stock of Flour City Body Corporation of Minneapolis, which she acquired in about 1930. That I paid about $1,000 of the cost of such stock and my wife $3,000 a total of $4,000. * * *
Petitioner, in his reply to second amendment to answer, makes the following allegation: Petitioner denies that he had an investment of only $4,000 in the Flour City Body Corporation, a Minnesota corporation, for each of the years in question, as alleged by Respondent. Petitioner further alleges that his investment in said company was in the sum of $20,000 for each of the said years in question rather than the $4,000 alleged by respondent; that for the purpose of this case, the amount is unimportant for the reason that it is constant throughout the claimed taxable years. We agree with petitioner that where the amount is constant throughout the period it does not affect the ultimate determination of net worth. This applies whether we accept petitioner's constant figure or respondent's constant figure of $4,000. Under the circumstances, no further discussion is required. We accept respondent's figure for convenience. *259 Findings and Opinion Wheel Service Corporation (Item 44A) Respondent, on his net worth statement, includes the amount of $4,500 as of the year ended December 31, 1936, as the cost of stock of Wheel Service Corporation to petitioner. Petitioner in the affidavit submitted to compromise the alcohol tax liability dated July 2, 1937, stated, inter alia, as follows: * * *
That my wife owns 25% in the stock of Wheel Service Corporation of Minneapolis. That such stock was in my name at one time but was conveyed to her in about 1930. That such stock has cost about $4,500 in cash. * * *
Petitioner claims that the cost was $12,077.13, and that he sold the stock on January 15, 1940. The burden of proof of error rests with petitioner. Petitioner failed to produce acceptable evidence to support his claim that the cost of the stock was $12,077.13. His own affidavit is to the contrary, and the cost in the amount of $4,500 stated therein is corroborated by a transcript of the records of the company. We, therefore, sustain respondent on this issue. Findings and Opinion Hungry Jack Lodge (Item 57) Respondent, on his net worth statement, shows the amount of $3,600 with respect to petitioner's investment *260 in Hungry Jack Lodge (hereinafter sometimes called Lodge) for the years ended December 31, 1941, through December 31, 1947. Respondent concedes that petitioner owned said asset in the amount of $1,000 as of December 31, 1936. The issue as presented by the parties revolves around the question of when the amount of $2,600 was expended for improvements of the Lodge. Neither party claims additional cost after December 31, 1941. Respondent used a uniform figure of $3,600 as of the years ending December 31, 1941, to December 31, 1947, and petitioner has raised no issue in this respect. We think that the evidence clearly supports respondent's position that the amount of $2,600 was expended for improvements in 1939, or in any event was not expended on or before December 31, 1936. The burden of proof of error rests with petitioner on this issue. We find no acceptable evidence supporting his contention. Findings of Fact Fraud During the taxable years 1937 through 1947, inclusive, petitioner was engaged in various gambling enterprises in Minnesota which were illegal. In addition to gambling ventures in the Twin Cities area, petitioner was an investor in liquor establishments and in companies *261 which operated pinball machines and music boxes. About 74 percent of the income which petitioner reported on his Federal returns for each of the taxable years involved here was derived from gambling activities. No records (other than temporary slips of paper) or central control accounts were maintained by petitioner with respect to his gambling income. Said slips of paper did not show the sources of his gambling income or how he arrived at the net results. In the course of the investigation of petitioner relating to the criminal tax case, Revenue Agent McKusick was shown no personal books and records of petitioner, although he inquired about such books from Weinstock. Likewise, there were no books and records kept by petitioner which could be investigated by the revenue agents with respect to the instant proceeding. Petitioner often maintained his stock or investment in businesses in the name of other individuals. Petitioner owned stock in Casablanca, Inc., in the name of F. J. Wickers, a boy who had worked for petitioner in the Wheel Service Corporation and was still employed by him at the time of trial. Petitioner's stock investment in Mohawk Liquor Corporation was maintained in *262 the name of Cary. Petitioner also had a proprietary interest in the partnership known as Shepard and Garland. No person by the name of Garland actually had an interest in the partnership. Ferdinand Hollen operated the Quality Drug Store and the Phoenix Drug Store. He considered Shepard as his only partner in said stores. Petitioner had an investment in both of these stores, in addition to the loans to Quality Drug Company, which is Item 13 of respondent's net worth schedule. Jessie Skavene, formerly known as Jessie Beshears, was employed at Coin-A-Matic (in which petitioner had an interest) as an office clerk and bookkeeper. While employed there, she took out a liquor license for the Viking Liquor Store in which petitioner also had an interest. All of the net profit from the Viking Liquor Store in the amount of $11,495 was reported on Beshear's Federal income tax return for 1943. Petitioner and Shepard paid Beshear's income tax for said year. In connection with Question No. 11 of the written questions submitted by the Internal Revenue Service to petitioner through his attorney, O'Gordon, it was stated that on or about March 14, 1944, an income tax return was filed by Leonard H. Weinstock *263 and Company for Jessie Beshears, 2002 Pillsbury Avenue, Minneapolis, showing tax liability of $2,811.29. It was asked how much of this amount was advanced by petitioner. The answer given in writing was "one-third." Petitioner used a bank account in the First National Bank of Minneapolis in the name of Peter Allen. Petitioner's signature appeared on the signature card of the bank. Said account was opened on February 8, 1928. Petitioner also used a bank account in said bank in the name of W. A. Arnold. The signature of petitioner appeared on the signature card of this account at the bank. The name of Pete Hackett, who was an employee of petitioner, also appeared on the signature card of the bank. The account was opened on November 8, 1929. Petitioner used said bank accounts entitled W. A. Arnold and Pete Allen in conjunction with other individuals. The bank account in the name of Peter Allen was used by petitioner for alcohol and bootlegging activities. Petitioner did not know a person by the name of Peter Allen. Efforts were made by Masica and other revenue agents during the prior criminal investigation to obtain records relating to the personal business affairs of Banks. When Revenue *264 Agent McKusick inquired of petitioner's accountant, Weinstock, regarding petitioner's checking account, the agent was given incomplete cancelled checks from certain bank accounts of petitioner. In each instance, some bank statements and checks were missing. Weinstock did not furnish McKusick any other individual records of petitioner, although the agent inquired about them. Petitioner reported some of his gambling income on his returns for the years involved herein under such designations as "miscellaneous fees and commissions" and similar designations. It was petitioner's practice to take a round figure and insert it in his return describing it as "miscellaneous" income. Income designated on petitioner's returns in this manner was given to his accountant as a lump sum amount at the end of each taxable year. Petitioner's accountant had no idea where such income came from. On May 30, 1952, a jury found petitioner guilty of criminal tax evasion for the taxable years 1945, 1946, and 1947 by use of the net worth plus nondeductible expenditures method. During said criminal trial, petitioner was represented by competent counsel. United States v. Thomas V. Banks, - F. Supp. (D. Minn. 1952). *265 As a result of his conviction, petitioner was sentenced to three years in prison and fined $10,000. Ultimately, said decision of the United States District Court was affirmed. Banks v. United States, 204 F. 2d 666 (C.A. 8, 1953); reaffirmed 223 F. 2d 884 (C.A. 8, 1955), certiorari denied 350 U.S. 986 (1956). A substantial amount of taxable income was omitted from the Federal income tax return of petitioner for each of the taxable years 1942 through 1946, inclusive. A part of the deficiency for each of said years was due to fraud with intent to evade taxes. Opinion Fraud We now consider the question of whether or not a part of the deficiency for each of the years 1936 to 1947, inclusive, was due to fraud with intent to evade tax within the meaning of section 293(b). The burden of proof with respect to fraud is upon the respondent, and he must establish fraud on the part of petitioner by clear and convincing evidence. Patson v. Commissioner, 22 T.C. 912, affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956); Arlette Coat Co., Inc., 14 T.C. 751 (1950). It should be noted at the outset that the first segment of the net worth statement is for the calendar years *266 ending 1 936 to 1941, inclusive. Respondent's net worth schedule for these years contains a detailed itemization of assets and liabilities only as of December 31, 1936, and December 31, 1941. Respondent's determination of the amount of income received by petitioner during each of the years from December 31, 1936, to December 31, 1941, inclusive, is calculated by comparing net worth as of December 31, 1941, with net worth as of December 31, 1936, and allocating the excess of the former over the latter to the intervening years by mathematical average. Such an approach may well be appropriate (as we hold infra) where the issue concerns the determination of deficiencies in which event there is a presumption of correctness of respondent's determination, and the burden of proof rests with petitioner. Where the issue is one of fraud, however, the picture is quite different, and the burden rests with respondent to establish fraud by clear and convincing evidence. The affirmative evidence in the case furnishes no basis for an inference that petitioner's assets increased ratably over the five-year period in issue or that the increases occurred during one, or several, or all of said years. The *267 increase in petitioner's assets may have occurred entirely in one year and the fraud, if any, might have been perpetrated solely in that year. Bearing in mind that under our income tax system each year is a separate taxable unit, we hold that under the circumstances here presented we cannot spread additions to tax for fraud over a period of years on a purely mathematical basis. Equally fundamental is the proposition that in four of the five years in question, limitations will apply absent a finding that, as to each of said four years, petitioner filed a false and fraudulent return with intent to evade taxes. On respondent's approach, and on the record, we cannot hold that the return for any of the four years was false and fraudulent with the above-indicated intent. In so holding, we follow in principle the view previously stated, where fraud was the issue, in W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). (The problem now under discussion was not before the court on appeal.) Since we find that respondent has failed to establish fraud in any one or more of the years 1937 to 1940, inclusive, there can be no additions to tax for any of said years. By the same *268 token, a determination of deficiencies for any of the years 1937 to 1940, inclusive, is barred by limitations. The year 1941 is open by waiver and will be considered infra as to the question of a deficiency. Turning to the second segment of the net worth schedule, our conclusions with respect to the issue of fraud for the taxable years 1942 through 1947, inclusive, are based upon consideration of the entire record properly before us, and we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002 (1954); Wallace H. Petit, 10 T.C. 1253 (1948); L. Schepp Co., 25 B.T.A. 419 (1932). We also recognize that in this, as in many fraud cases, proof of fraud, if it is to be established, must depend in some respects upon circumstancial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518, 532 (1930). Our finding of an understatement in taxable income for each of the years in question *269 for the purposes of the deficiencies involved was based in some respects upon petitioner's failure to meet his burden of proof. We are mindful that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our findings on that basis. We have held that a mere understatement of income does not establish fraud. James Nicholson, 32 B.T.A. 977 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. After a painstaking analysis of all of the evidence in this case, and bearing in mind the above stated principles, we are convinced that petitioner received substantial taxable income during each of the years 1942 through 1947, inclusive, from his various activities, including gambling, in excess of that reported on his returns for those years, and that in each of said years a part of the deficiency was due to fraud with intent to evade taxes. It is well settled that *270 respondent, in sustaining his burden of proof of fraud, need not prove the precise amount of the deficiency attributable to such fraud, but only that a part of the deficiency is attributable thereto. United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948), certiorari denied 335 U.S. 853. The understatements of income in each of the years 1942 to 1947, inclusive, were both substantial in amount and substantial in proportion to reported income, of which we have no doubt that petitioner was fully aware. We reject petitioner's testimony to the effect that his returns were honest, correct, and complete because analysis of the record demonstrates the contrary. Moreover, petitioner's history of wanton disrespect for observance of the law and his conflicting testimony and affidavit under oath do not encourage belief in his uncorroborated statements. That his returns were prepared by an accountant does not lead to a different view since it is clear that the accountant himself was not informed of all of the facts essential to the preparation of such returns. Even if this case were devoid of the usual indicia of fraud, the courts have held that consistent understatements of income in substantial *271 amounts over a number of years, standing alone, are persuasive evidence of fraudulent intent to evade taxes. Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959); Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming on this point a Memorandum Opinion of this Court; Bryan v. Commissioner, 209 F. 2d 822, 828 (C.A. 5, 1954), certiorari denied 348 U.S. 912; Jack M. Chesbro, 21 T.C. 123 (1953), affd. 225 F. 2d 674 (C.A. 2, 1954), certiorari denied 350 U.S. 995; Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16; W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). In Epstein v. United States, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868, the Court stated (p. 933): The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F. 2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir. 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an *272 inference of willfulness." As indicated above in the instant case, the correct net income for each of the years 1942 to 1947, inclusive, greatly exceeded the amount reported by petitioner. His understatements of income were so large, regular, and frequent, extending over a period of at least the six years 1942 to 1947, inclusive, that there is no escape from the inference of a deliberate intention to defraud the Government of the taxes lawfully due it. While the net worth method is not so precise as to preclude the possibility of minor inaccuracies, facts for each of the years 1942 through 1947 to preclude the possibility of any inaccuracies of sufficient size as to explain away or successfully refute the otherwise obvious inference of deliberate fraud. In addition to the consistent pattern of substantial understatements, the record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that the petitioner knowingly and intentionally evaded his taxes during the taxable years 1942 through 1947, inclusive. Without suggesting that the following discussion is at all complete, we merely advert to the following *273 indicia of fraud. Petitioner completely failed to maintain or retain any books and records covering his extensive gambling activities and the results therefrom which could be audited by the Internal Revenue Service for the taxable years involved herein. Assuming that the "legitimate" businesses in which Banks was financially interested did maintain adequate books and records as petitioner avers, the record shows that a large part of petitioner's income was from gambling activities and that, as above indicated, he maintained no records with respect to his gambling income, other than mere slips of paper. Further indication of fraud is found in the fact that Banks maintained some bank accounts and investments in sundry enterprises in the names of nominees. The record shows that petitioner used a bank account in the First National Bank of Minneapolis in the name of W. A. Arnold. Petitioner was not sure whether such an individual existed, asserting that he "might" have represented himself as Arnold. Petitioner was unable to explain why he kept his investment in Casablanca, Inc., in the name of F. J. Wickers, a boy who worked for him; or why his stock interest in Mohawk Liquor Corporation *274 was maintained in the name of Cary. Petitioner admitted at the trial that he had a financial interest in the Phoenix and Quality Drug Stores. Hollen, the manager of said stores did not know petitioner, or that anyone other than Shepard had ever advanced money to said stores. When petitioner was asked if he reported income from the Quality Drug Company, he stated that if the money came from there it was reported because "any legitimate business that I was ever in I reported the income." While the use of such nominees may be innocuous under some circumstances, here the various transactions by which Banks tried to disguise or hide some of his assets suggest concealment of income. Another badge of fraud is that part of petitioner's income from the Viking Liquor Store for 1943 was reported on the return for that year of Jessie Beshears, an employee in the store. Petitioner admitted that he paid one-third of the tax on Beshears's return for 1943. Beshears did not know that Banks was one of the individuals who had paid part of her tax. She only knew that someone else had paid her tax for that year. Petitioner's accountant, Weinstock, knew that Beshears had no proprietary or financial interest *275 in the Viking Liquor Store. Further evidence of fraud is found in petitioner's lack of cooperation with the investigating agents. When written questions were submitted to petitioner through his attorney, O'Gordon, (who was acting under a power of attorney) petitioner submitted answers in which he failed to answer certain of the questions submitted by McKusick. O'Gordon tried to get the answers from petitioner. At the instant trial, petitioner claimed that some of the answers which he had given in response to the aforesaid questions, particularly with respect to the H. G. Lee loan and the T. E. Ewing receivable, were not correct answers. Such inconsistencies between statements made to the revenue agents and testimony at the trial are some evidence of fraud. Abraham Galant, 26 T.C. 354, 365 (1956). It is noteworthy in this connection that petitioner claimed at the trial that he intentionally signed and swore to the affidavit which he submitted to compromise his alcohol tax liability for prior years knowing it to be "false." In Pincus Brecher, 27 B.T.A. 1108-1109, where the taxpayer admitted that he gave false testimony under oath before a referee in bankruptcy with respect to many *276 of the same items under scrutiny in the tax proceeding, we stated (p. 1109): As to the fraud penalties, the record shows that an oath means nothing to the petitioner; that he would give false testimony if he thought the truth would hurt his business. The maxim, "falsum in uno, falsum in omnibus" may be a harsh rule, but here it seems justified. * * * Persuasive evidence of fraud is indicated herein by petitioner's use of misleading descriptions of the nature of his income on his Federal returns. Petitioner described much of his gambling income under such designations as "miscellaneous fees and commissions" and similar designations. Also, at the trial, petitioner was unable to describe the nature of income described as "salary." Petitioner testified that he would take a figure at random and insert the figure in his income tax return, describing it as "miscellaneous" income. Petitioner admitted that his reason in doing this was that if the Internal Revenue Service in an examination discovered that a specific item was omitted from his return, he would be in a position to claim that the omitted item was included in the "miscellaneous" income figure. The idea to take a figure at random *277 and describe it as "miscellaneous" income originated with petitioner rather than with his accountant. Another badge of fraud is the fact that petitioner was engaged in illicit businesses during the taxable years 1937 through 1947, inclusive, and a substantial part of his reported income was from gambling. In Wallace Petit, 10 T.C. 1253 (1948), we indicated that the carrying on of businesses which are not legitimate is in itself some indication of fraud. It is clear that petitioner's conviction of criminal tax evasion for the taxable years 1945, 1946, and 1947 (3 of the 11 years involved herein) is also evidence of fraud as to those years. Eugene Vassalo, 23 T.C. 656 (1955); Abraham Galant, 26 T.C. 354 (1956). Some of the factors which were considered indicative of fraud for said years by the United States Court of Appeals, Eighth Circuit, in Banks v. United States, 204 F. 2d 666 (1953), (p. 672), are as follows: Here the evidence shows that defendant failed to report his entire income for taxation; that he paid only a part of the taxes which he should have paid. He held property in the names of nominees; he procured cashier's checks with which he paid for property. He did not *278 furnish to his attorney, Mr. Weinstock, who made out his income tax returns, information necessary to make accurate returns. A part of such information which he furnished was on adding machine tape. He simply told Weinstock that the source of such income was "wagering." This, of course, referred to a part of his income only. The evidence shows that the total income included in his returns was much less than his actual income. The jury could very well find from all the testimony that defendant willfully attempted to evade and defeat his federal income taxes. The Supreme Court, in considering the question of a basis for inference of fraud said in Spies v. United States, 317 U.S. 492, (1943) (p. 499): By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. *279 If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime. [Italics supplied. ] Upon consideration of all relevant factors, we hold that respondent has proved by clear and convincing evidence that there are deficiencies in petitioner's income tax for each of the years 1942 to 1947, inclusive, and that a part of each such deficiency is due to fraud with intent to evade taxes. Respondent argues petitioner is collaterally estopped from denying the fraud for the taxable years 1945, 1946, and 1947 by reason of his conviction for criminal fraud for those years. Our holding for respondent on the fraud issue for said years on the merits renders a decision on this last contention unnecessary. But see Meyer J. Safra, 30 T.C. 1026 (1958), where such a plea of collateral estoppel was denied. Findings and Opinion Deficiency - 1941 Respondent determined that petitioner understated income for 1941 in the amount of $8,029.29. Respondent's determination is prima facie correct and the burden of proof of error lies with petitioner. Respondent's approach is, in effect, to calculate the *280 increase in net worth as of December 31, 1941, over that of December 31, 1936, allocate one-fifth of the increase to 1941, give credit for one-fifth of the net income reported by petitioner over the five years, give further credit for income reported by Reta for 1941, and add back "below the line" items such as living expense and income taxes paid adjusted to 1941. Under the circumstances of the instant case, we approved the allocation theory in principle as to determination of a deficiency. Where, as here, the difficulty in determining a precise amount for each year is due largely to petitioner's failure to maintain or retain proper records, his failure to file proper returns, respondent in determining a deficiency as an administrator, may adopt a practical approach to prevent avoidance of taxes. We think the approach in the present case is a proper one and is not arbitrary. Estate of W. D. Bartlett, 22 T.C. 1228, 1231, 1232 (1954). Net worth as of December 31, 1936, and December 31, 1941, are ascertainable with reasonable accuracy, and the mathematical allocation to each of the five years tends to be favorable to petitioner because it eliminates peaks and valleys in particular *281 years. The fact that the first four years are barred by limitations does not affect the issue. Needless to add, petitioner does not suggest a better approach and, except for certain adjustments discussed previously, and reflected in Schedule C, no error has been demonstrated, although the burden rests with petitioner. As stated above, respondent determined an understatement of $8,029.29 for 1941. We have reduced this to $2,928.17. Each disputed item has been discussed elsewhere in this Opinion, and all adjustments and recomputations for 1941 are reflected in our Schedule C. It would serve no useful purpose to repeat our detailed analysis at this point. We hold, on the basis of the foregoing, that petitioner understated income for 1941 in the amount of $2,928.17. The surrounding circumstances indicate that this amount is on the low side, but this is speculative and we find no way to make the figure more precise. Findings and Opinion Additions to Tax - 294(d)(2) In the year 1946 petitioner paid Federal income tax in the amount of $10,556.98. In 1947, he paid an estimated tax in the amount of $5,000. For the year 1947, petitioner reported an adjusted gross income on his return in the *282 amount of $24,876.25. The return for 1947 was filed on March 15, 1948. Respondent concedes that petitioner is not liable for the addition to tax provided by section 294(d)(2), supra, for any of the taxable years 1943 through 1946, inclusive, because petitioner's payment of estimated tax in each year of said period was in an amount at least as great as the tax shown on his return for the preceding year. Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1937), modifying a Memorandum Opinion of this Court; Herbert Schellenbarg, 31 T.C. 1269, 1279 (1959). With respect to the taxable year 1947, however, respondent avers that the addition to tax under said statute would apply since petitioner paid an estimated tax in the amount of $5,000, and the tax paid in the preceding year 1946 was in the amount of $10,556.98. Petitioner, on whom the burden of proof rests, has offered no evidence or argument on this issue. We have no occasion, therefore, to discuss the problem here except to say that the appropriate amounts of any such additions under section 294(d)(2), supra, will be determined, if applicable, upon a final computation of the deficiencies for 1947. Decision will be entered under *283 Rule 50. Footnotes
a. Computation for 1941
5-year increase in net worth
$17,142.76
Living expenses - 5 years
30,000.00
Payment of taxes - 5 years
6,458.04
Corrected net income Thomas and Reta - 5 years
$53,600.80
Less: Net income reported by Reta
236.43
Corrected net income Thomas - 5 years
$53,364.37
Net income reported by Thomas - 5 years
22,577.14
Understated net income - Thomas 5 years
$30,787.23
1/5 allocated to 1941
$ 6,157.45 Compare with respondent's Schedule B where the amount allocable to 1941 is computed at $8,029.29. We think it is unnecessary to compute a reconciliation of the two figures since we, in our Schedule C, set forth our computation of net income of petitioner as determined by us in an amount less than calculated by respondent.
b↩
1. In the absence of fraud, of course, the unforgiven portion of tax due for 1942 is also open for assessment as tax for 1943 under the provisions of Section 6 of the Current Tax Payment Act of 1943.↩
*. Per respondent's second amendment↩ to answer (but to be adjusted further by respondent's concession in relation to 3817 Drew Avenue South, being item 58 of Exhibit A attached to said amendment).
2. Weinstock, petitioner's accountant, testified as follows: Q: Did Mr. Banks ever tell you anything about the cash on hand? A: He told me he had cash, but I said, "For you to tell me and me to tell Mr. McKusick is certainly no evidence, there is nothing I can do about it unless we have some evidence on it." Q: When did he tell you that sir? A: He told me that when I was negotiating with Mr. McKusick. Q: Why didn't you include that on the answers to the questions that were furnished to the government? A: I didn't have the questions and answers, I had nothing to do with those excepting that Mr. O'Gordon came to my office to get some of the answers from me and I asked what he was going to answer in the question No. 1 regarding cash, and he said, "I am not going to answer that," and I said, "If you don't you are crazy, that is certainly one question that should be answered."↩
*. Not in issue.↩
3. Regs. 111, sec. 29.22(c)-6. * * *
Sec 29.22(c)-6. INVENTORIES of LIVESTOCK RAISERS and OTHER FARMERS. - Farmers may change the basis of their returns from that of receipts and disbursements to that of an inventory basis provided adjustments are made in accordance with one of the two methods outlined in (1) and (2) below. It is optional with the taxpayer which method is used, but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method be authorized by the Commissioner. * * *
Because of the difficulty of ascertaining actual cost of livestock and other farm products, farmers who render their returns upon an inventory basis may value their inventories according to the "farm-price method", which provides for the valuation of inventories at market price less direct cost of disposition. If the use of the "farm-price method" of valuing inventories for any taxable year involves a change in method of valuing inventories from that employed in prior years, permission for such change shall first be secured from the Commissioner as provided in section 29.41-2. In such case the opening inventory for the taxable year in which the change is made should be brought in at the same value as the closing inventory for the preceding taxable year. If such valuation of the opening inventory for the taxable year in which the change is made results in an abnormally large income for that year, there may be submitted with the return for such taxable year an adjustment statement for the preceding year. This statement shall be based on the "farm-price method" of valuing inventories, upon the amount of which adjustments the tax, if any be due, shall be assessed and paid at the rate of tax in effect for such preceding year. If an adjustment for the preceding year is not, in the opinion of the Commissioner, sufficient clearly to reflect income, adjustment sheets for prior years may be accepted or required. * * *↩
4. SEC. 29.41-2. BASES OF COMPUTATION AND CHANGES IN ACCOUNTING METHODS - Approved standard methods of accounting will ordinarily be regarded as clearly reflecting income. A method of accounting will not, however, be regarded as clearly reflecting income unless all items of gross income and all deductions are treated with reasonable consistency See section 48 for definitions of "paid or accrued" and "paid or incurred." All items of gross income shall be included in the gross income for the taxable year in which they are received by the taxpayer, and deductions taken accordingly, unless in order clearly to reflect income such amounts are to be properly accounted for as of a different period. But see sections 42 and 43. See also section 48. For instance, in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method.